IN

# THE SUPREME COURT

OF

## PENNSYLVANIA.

### 1868.

## Commonwealth *versus* Drum.[1]

1. Malice comprehends not only a particular ill will, but every case where there is wickedness of disposition, hardness of heart, cruelty, recklessness of consequences, and a mind regardless of social duty, although a particular person may not be intended to be injured.

2. In murder if an intention to kill exists it is wilful;—if the intention be accompanied by such circumstances as evidence a mind fully conscious of its own purpose and design, it is deliberate;—and if sufficient time be afforded to enable the mind fully to frame the design to kill and to select the instrument, or to frame the plan to carry this design into execution, it is premeditated.

3. In the kind of murder in the first degree described as "wilful, deliberate and premeditated," there must be the fully-formed purpose to kill, with so much time for deliberation and premeditation, as to convince the jury that this purpose is not the immediate offspring of rashness and impetuous temper, and that the mind has become fully conscious of its own design.

4. He who uses a deadly weapon upon another at some vital part, with manifest intention to use it upon him, must in the absence of qualifying facts be presumed to know that his blow is likely to kill, and must be presumed to intend death.

5. He who uses a deadly weapon without sufficient cause of provocation, must be presumed to do it wickedly or from a bad heart.

---

[1] This case from a county in the Western District furnishes the form of a record in a Court of Oyer and Terminer held by a Judge of the Supreme Court, made up under the direction of Judge AGNEW. For this reason, as well as because of the important legal principles declared in his charge, the case is, with his approbation, inserted here.

[Commonwealth *v.* Drum.]

6. He who takes the life of another with a deadly weapon and with a manifest design thus to use it upon him, with sufficient time to deliberate and fully to form the conscious purpose of killing, and without any sufficient reason or cause of extenuation, is guilty of murder in the first degree.

7. The difference between murder and manslaughter is this : manslaughter is never attended by legal malice or depravity of heart, that condition or frame of mind exhibiting wickedness of disposition, recklessness of consequences or cruelty.

8. To make killing manslaughter, it is necessary that the circumstances should take away every evidence of cool depravity of heart, or of wanton cruelty.

9. To reduce an intentional blow, &c., resulting in death to manslaughter, there must be sufficient cause of provocation, and a state of rage or passion without time to cool, placing the person beyond the control of his reason and suddenly impelling him to the deed.

10. If there be provocation without passion or passion without sufficient cause of provocation ; or there be time to cool and reason has resumed its sway, the killing will be murder.

11. Insulting or scandalous words, or actual indignities of a light or trivial kind, to the person are not sufficient cause of provocation.

12. Whenever the act evinces deadly revenge and not the mere heat of blood, or is the result of a devilish disposition, not merely the frenzy of rage, it is not manslaughter but murder.

13. All homicide is presumed to be murder until the contrary appear in the evidence ; and the burthen of reducing it to manslaughter is on the accused.

14. The *presumption* against the accused is no higher than that the homicide is murder in the second degree ; and it lies on the Commonwealth to establish the facts and circumstances which constitute murder in the first degree.

15. To excuse homicide by a plea of self defence, it must appear that the slayer had no other possible or at least probable means of escaping, and that his act was one of necessity.

16. If the slayer use a deadly weapon and under such circumstances as he must be aware that death will be likely to ensue, the necessity to excuse the homicide must be great and must arise from imminent peril to life or of great bodily injury.

17. If the object of the assailant appears to be to commit only an ordinary assault and battery, it will not excuse a man of equal or nearly equal strength in taking his assailant's life with a deadly weapon. The act of the slayer must not be entirely disproportioned to the attack upon him.

18. The burthen is upon the slayer to prove that there was an actual necessity for taking life or a seeming one, so reasonably apparent and convincing to him as to lead him to believe he could defend himself only in that way.

19. The reasonable doubt to the benefit of which the accused is entitled, must fairly arise out of the evidence, not be merely fancied or conjured up : such a difficulty as fairly strikes a conscientious mind and clouds the judgment.

20. Under the plea of self-defence, if the evidence leaves the prisoner's extenuation in doubt he cannot be acquitted of all crime, but must be convicted of homicide in some of its grades.

21. Murder in the first and second degree, manslaughter, and excusable homicide defined, distinguished, and applied in this case : also reasonable doubt to acquit and that arising under plea of self-defence.

22. Upon a certificate of the president judge of the proper district, of a sufficient cause of inability to try a prisoner in the Oyer and Terminer, the Supreme Court will appoint one of its number to hold a Court of Oyer and Terminer.

[Commonwealth v. Drum.]

23. The prothonotary of the Common Pleas · is *ex officio* clerk of the Oyer and Terminer of the Supreme Court in a county where there is no prothonotary of the Supreme Court (Act of April 14th 1834, § 61).

24. The jury for the trial in the Oyer and Terminer of the Supreme Court, will be taken from the panel of jurors returned to the venire from the Court of Oyer and Terminer.

WILLIAM DRUM was charged in the Court of Quarter Sessions of Westmoreland county for the murder of David Mohigan. A true bill having been found by the grand jury of that court, it was certified into the Court of Oyer and Terminer of the same county.

Subsequently the Hon. Joseph Buffington, president of the Court of Common Pleas of Westmoreland county, certified to the Supreme Court that he was related to the defendant, and that this would be in the way of his presiding in the court for the trial of the indictment.

On the 22d of October 1868, the Supreme Court made the following order:—

"*Commonwealth* v. *Drum*.

"PER CURIAM. It having been made to appear to us by the certificate of the president judge of the Court of Common Pleas of said county, filed in this court, that there is a legal impediment by reason of relationship, in the way of his holding a Court of Oyer and Terminer for the trial of said prisoner, and said judge having besought us to assign one of our number to hold said court, so far as the trial of said prisoner is concerned, and being satisfied that we have the power, and that it is our duty, under the circumstances, to do so, we have *designated* and ORDERED our brother, Hon. Daniel Agnew, to hold the said court for the said trial, at the ensuing term of the said Court of Oyer and Terminer, in and for the said county of Westmoreland, to commence on the 9th day of November, A. D. 1868, pursuant to the precept issued for summoning and returning jurors for said term, and other orders legally made thereon."

The proceedings conducted under the direction of Judge Agnew are as follows:—

Be it remembered that at a session of the Court of Oyer and Terminer and General Jail Delivery duly convened and begun and holden at Greensburg, in and for the said county of Westmoreland, on Monday, the ninth day of November, A. D. one thousand eight hundred and sixty-eight, before the Hon. Daniel Agnew, one of the associate justices of the Supreme Court of the said Commonwealth, specially assigned by their order heretofore made on the twenty-second day of October in said year, and certified from the said Supreme Court, and a copy thereof filed in the said cause, to hold the said Court of Oyer and Terminer, and to

[Commonwealth *v.* Drum.]

hear and determine by oaths of twelve good and lawful men of the county aforesaid to be duly drawn from the panel of jurors returned by the sheriff of the said county in and for the Court of Oyer and Terminer, and impannelled and sworn and charged to inquire of the guilt or innocence of the said William Drum, who hath been indicted by a grand jury of the said county in the Court of Quarter Sessions of the peace in and for the said county, for the felonious and wilful murder of one David Mohigan, which said indictment hath been duly certified from the said Court of Quarter Sessions into the said Court of Oyer and Terminer in due form of law, as in and by the said indictment, and certificate to the said justice fully appears :—it was proceeded in as follows :—

And now at four o'clock, P. M. of the said ninth day of November, A. D. one thousand eight hundred and sixty-eight, the said The Hon. Daniel Agnew, justice of the Supreme Court aforesaid, having come into court to hold a session of the Court of Oyer and Terminer in and for said county, to try the aforesaid cause of The Commonwealth against the said William Drum, for the wilful and felonious murder of the said Daniel Mohigan, the said Joseph Buffington, president, and his associates, Robert Given and M. P. McLanahan, retire from the bench, and the same is forthwith taken by the said The Hon. Daniel Agnew, associate justice of the Supreme Court. And thereupon a Court of Oyer and Terminer is now begun to be holden before the said justice for the trial of the felony and murder aforesaid; and it appearing that no prothonotary of the said Supreme Court resided in the said county of Westmoreland, Lewis A. Johnson, prothonotary of the Court of Common Pleas of Westmoreland county aforesaid, took his place as clerk of said Court of Oyer and Terminer in accordance with the Act of Assembly in such case made and provided. And it being represented to the said justice by James Hazlett, Esq., lately elected and sworn into the office of district attorney in and for said county, that before his said election he had been of counsel with the said William Drum, the prisoner, the said justice doth appoint James Todd, Esq., the late district attorney, to prosecute on behalf of the Commonwealth in the said cause of The Commonwealth against the said William Drum. And thereupon the said cause being called to be heard before the said justice, at the request of the counsel for the Commonwealth and for the prisoner, the cause is laid over until to-morrow morning at ten o'clock, to which time the said last-mentioned Court of Oyer and Terminer is adjourned by the said justice.

And now, November 10th 1868, the court met, and the said justice having taken the bench, and the said cause of The Commonwealth against William Drum is again called, and the said

[Commonwealth *v.* Drum.]

William Drum cometh into open court under the custody of
Robert M. Reed, Esq., sheriff of the county aforesaid (into whose
custody in the jail of said county for the felony and murder
aforesaid he had before been committed), and being brought
to the bar here in his proper person by the said sheriff (to whom
he is also here committed), and forthwith being demanded con-
cerning the premises in the said indictment set forth and charged
upon him how he will acquit himself thereof, he saith that he is
not guilty thereof, and thereof for trial he puts himself upon the
country.   And the said James Todd, Esq., specially appointed by
the said justice in the room of the district attorney of the said
county, disqualified by impediment to prosecute in this behalf,
doth the like.   Therefore let a jury thereupon here immediately
be balloted for and come before the said justice, of free and
lawful men of the said county, by whom the truth of the matter
may be better known, and who are not of kin to the said William
Drum, to recognise on their oaths whether the said William Drum
be guilty of the felony and murder in the said indictment speci-
fied and set forth, or not guilty, because as well he the said James
Todd, special district attorney, who prosecutes for the Common-
wealth as aforesaid in this behalf as the said William Drum, have
put themselves upon the said jury.   And the jurors of the said jury
for this purpose duly returned, balloted for and drawn, that is to
say, David B. Weaver, &c. (naming them), being called come, who,
being elected, tried and sworn in due form of law (in the presence
of the said William Drum here in court) to speak the truth of and
concerning the premises, and having heard all the evidence, and
having had their charge by the said justice, afterwards come into
court, that is to say, on the 14th day of November aforesaid, and
here now do say that the said William Drum, here present in open
court in custody as aforesaid, is guilty of the felony and murder
aforesaid on him above charged in form aforesaid, as by the said
indictment aforesaid is above *supposed* against him; and they,
the said jury, do also at the same time find and say that he the
said William Drum is guilty of the said felony and murder in the
second degree; and thereupon the said William Drum is by the
said justice remanded to prison in custody aforesaid, to abide and
be subject to the further order and sentence of the said justice in
the said Court of Oyer and Terminer to be made in this behalf.

And now, on the same 14th day of November, the counsel with
the prisoner move the said justice that a new trial may be granted
to the said William Drum in the cause aforesaid.

And now, November 20th 1868, it is considered by the said jus-
tice in the Court of Oyer and Terminer aforesaid that the aforesaid
motion that a new trial be granted to the said William Drum be
overruled; and the said William Drum being brought into court
in custody as aforesaid, and it being demanded of him if he hath

[Commonwealth *v.* Drum.]

or knoweth anything to say wherefore the said justice should not proceed to judgment and sentence against him, he nothing further saith, unless as he before had said. Whereupon all and singular the premises aforesaid being seen and by the said justice fully understood, it is considered by the court here, that you, the said William Drum, be imprisoned by separate and solitary confinement, according to law, in the penitentiary of the Western District of Pennsylvania, in the city of Allegheny, for the term of four years and six calendar months, and that you pay the costs of prosecution, and you are hereby committed to the custody of the sheriff aforesaid for the purpose of having this sentence carried into execution.

(Signed)    L. A. JOHNSON, Prothonotary of the Court of Common Pleas, &c., and Clerk of the Oyer and Terminer of the Supreme Court.

Messrs. *Todd, Given* and *Latta,* conducted the prosecution.

Messrs. *Keenan, Hunter, Cowan* and *Foster,* conducted the defence.

Justice AGNEW charged the jury as follows:—

Gentlemen:—The solemnity of the form in which the prisoner has been arraigned, and through which you have been set apart to become his triers, is well calculated to impress your minds with the high responsibility of the duty you have taken upon you. It should remind you that you are not to be blind to the interests of society in the pity you may feel for his youth; nor to forget the justice due to him in the horror you may feel for the crime. Following the pathway of the evidence, you should turn neither to the right nor the left, except as its light may illumine, guide and direct you. Have you any impressions unfavorable to capital punishment? You must discard them, knowing and feeling the conviction that not you, but the law inflicts it. You do not pronounce the sentence which condemns to death; that belongs to the court; but you simply say whether he has committed the deed which the indictment charges against him; *you* only find a true verdict.

You must not be affrighted from duty by the consequences of your finding. The weak and timid mind, alarmed at the picture which eloquence invokes, shrinks and often fears to follow whither the evidence leads. But the consequences are not yours—they follow the crime and not the finding. You should then dismiss the fear of consequences from your minds, except so far as their dread import should make you cautious, deliberate and just in weighing the evidence, and clear and satisfied in the judgment you form upon it. If, through fear, pity, indignation or passion,

[Commonwealth *v.* Drum.]

you suffer your minds to be drawn away from a true and just verdict, you do err.  Remember this, as a kind and faithful warning of the minister of justice, to preserve you wholly blameless in the high office you are called to perform.

The law of our state has made wilful, deliberate and premeditated murder a capital crime.  Sworn, as we are, to obey that law, we must know no other guide, remembering that the powers that be are ordained of God, and that we needs must be subject to them, not only for the wrath they may invoke, but for our own conscience' sake.  Then hold the balance firmly, that justice may be done both to the Commonwealth and to the prisoner; such words as rich and poor, high and low, should have no place in your thoughts.  You would not willingly err, but you must endeavor not to err.  Search your consciences for the source of every judgment.  Let your convictions, carefully and deliberately formed, be such that you may follow them to their fountain in the hidden depths of the heart where the Unseen Eye alone can penetrate, and there, in that dread presence, challenge their true source. ·

A life has been taken.  The unfortunate David Mohigan has fallen into an untimely grave; struck down by the hand of violence; and it is for you to determine whose was that hand, and what its guilt.  The prisoner is in the morning of life; as yet so fresh and fair.  As you sat and gazed into his youthful face, you have thought, no doubt, most anxiously thought, is his that hand ?  Can he, indeed, be a murderer ?  This, gentlemen, is the solemn question you must determine upon the law and the evidence.

At the common law murder is described to be, when a person of sound memory and discretion unlawfully kills any reasonable creature in being and under the peace of the Commonwealth, with malice aforethought, expressed or implied.  The distinguishing criterion of murder is malice aforethought.  But it is not malice in its ordinary understanding alone, a particular ill-will, a spite or a grudge.  Malice is a legal term, implying much more. It comprehends not only a particular ill-will, but every case where there is wickedness of disposition, hardness of heart, cruelty, recklessness of consequences, and a mind regardless of social duty, although a particular person may not be intended to be injured.  Murder, therefore, at common law embraces cases where no intent to kill existed, but where the state or frame of mind termed malice, in its legal sense, prevailed.

In Pennsylvania, the legislature, considering that there is a manifest difference in the degree of guilt, where a deliberate intention to kill exists, and where none appears, distinguished murder into two grades—murder of the first and murder of the second degree; and provided that the jury before whom any person indicted for murder should be tried, shall, if they find him guilty

thereof, ascertain in their verdict whether it be murder of the first or murder of the second degree. By the Act of 31st March 1860, " all murder which shall be perpetrated by means of poison, or by lying in wait, or by any other kind of wilful, deliberate and premeditated killing, or which shall be committed in the perpetration of, or attempt to perpetrate any arson, rape, robbery or burglary, shall be deemed murder of the first degree; and all other kinds of murder shall be deemed murder of the second degree."

In this case we have to deal only with that kind of murder in the first degree described as "wilful, deliberate, and premeditated." Many cases have been decided under this clause, in all of which it has been held that the *intention* to kill is the essence of the offence. Therefore, if an intention to kill exists, it is wilful; if this intention be accompanied by such circumstances as evidence a mind fully conscious of its own purpose and design, it is deliberate; and if sufficient time be afforded to enable the mind fully to frame the design to kill, and to select the instrument, or to frame the plan to carry this design into execution, it is premeditated. The law fixes upon no length of time as necessary to form the intention to kill, but leaves the existence of a fully formed intent as a fact to be determined by the jury, from all the facts and circumstances in the evidence.

A learned judge (Judge Rush, in Commonwealth *v.* Richard Smith) has said: "It is equally true both in fact and from experience, that *no* time is too short for a wicked man to frame in his mind his scheme of murder, and to contrive the means of accomplishing it." But this expression must be qualified, lest it mislead. It is true that such is the swiftness of human thought, that no time is so short in which a wicked man may not form a design to kill, and frame the means of executing his purpose; yet this suddenness is opposed to premeditation, and a jury must be well convinced upon the evidence that there was time to deliberate and premeditate. The law regards, and the jury must find, the actual intent; that is to say, the fully formed purpose to kill, with so much time for deliberation and premeditation, as to convince them that this purpose is not the immediate offspring of rashness and impetuous temper, and that the mind has become fully conscious of its own design. If there be time to frame in the mind, fully and consciously, the intention to kill, and to select the weapon or means of death, and to think and know beforehand, though the time be short, the use to be made of it, there is time to deliberate and to premeditate.

The proof of the intention to kill, and of the disposition of mind constituting murder in the first degree, under the Act of Assembly, lies on the Commonwealth. But this proof need not be express or positive. It may be inferred from the circumstances.

[Commonwealth v. Drum.]

If, from all the facts attending the killing, the jury can fully, reasonably, and satisfactorily infer the existence of the intention to kill, and the malice of heart with which it was done, they will be warranted in so doing. He who uses upon the body of another, at some vital part, with a manifest intention to use it upon him, a deadly weapon, as an axe, a gun, a knife or a pistol, must, in the absence of qualifying facts, be presumed to know that his blow is likely to kill; and, knowing this, must be presumed to intend the death which is the probable and ordinary consequence of such an act. He who so uses a deadly weapon without a sufficient cause of provocation, must be presumed to do it wickedly, or from a bad heart. Therefore, he who takes the life of another with a deadly weapon, and with a manifest design thus to use it upon him, with sufficient time to deliberate, and fully to form the conscious purpose of killing, and without any sufficient reason or cause of extenuation, is guilty of murder in the first degree.

All murder not of the first degree, is necessarily of the second degree, and includes all unlawful killing under circumstances of depravity of heart, and a disposition of mind regardless of social duty; but where no intention to kill exists or can be reasonably and fully inferred. Therefore, in all cases of murder, if no intention to kill can be inferred or collected from the circumstances, the verdict must be murder in the second degree.

Manslaughter is defined to be the unlawful killing of another without malice expressed or implied; which may be voluntarily in a sudden heat, or involuntarily, but in the commission of an unlawful act. Voluntary manslaughter often so nearly approaches murder, it is necessary to distinguish it clearly. The difference is this : manslaughter is never attended by legal malice or depravity of heart—that condition or frame of mind before spoken of, exhibiting wickedness of disposition, recklessness of consequences or cruelty. Being sometimes a wilful act (as the term voluntary denotes) it is necessary that the circumstances should take away every evidence of cool depravity of heart or wanton cruelty. Therefore, to reduce an intentional blow, stroke or wounding, resulting in death, to voluntary manslaughter, there must be sufficient cause of provocation, and a state of rage or passion, without time to cool, placing the prisoner beyond the control of his reason, and suddenly impelling him to the deed. If any of these be wanting—if there be provocation without passion, or passion without a sufficient cause of provocation, or there be time to cool, and reason has resumed its sway, the killing will be murder.

Insulting or scandalous words are not sufficient cause of provocation; nor are actual indignities to the person of a light and trivial kind. Whenever the act evidences a deadly revenge, and not the mere heat of blood; whenever it is the result of a devilish

8 P. F. SMITH—2

disposition, and not merely the phrensy of rage, it is not man-slaughter, but murder.

Having stated the law of the crime, we now note the law of the evidence. And, first, it may be stated as a general rule, that all homicide is presumed to be malicious, that is, murder of some degree, until the contrary appears in evidence. Therefore, the burthen of reducing the crime from murder to manslaughter, where it is proved that the prisoner committed the deed, lies on him. He must show all the circumstances of alleviation or excuse upon which he relies to reduce his offence from murder to a milder kind of homicide, unless, indeed, where the facts already in evidence show it. But though the homicide, without the circumstances of alleviation or excuse, is presumed to be murder, it is not presumed to be murder of the first degree. The presumption against him rises no higher than murder in the second degree, until it is shown by the Commonwealth to be murder in the first degree. It therefore lies on the Commonwealth to satisfy the jury of those facts and circumstances which indicate the deliberate intention to kill, and the cool depravity of heart and conscious purpose, which constitute, as before stated, the crime of murder in the first degree. When death ensues from the use of a deadly weapon, in a quarrel or affray, the jury must scan closely the conduct of both parties, their former relations and behavior, and the current of events; the character of the weapon, the manner of its use, and circumstances attending it; and by a careful survey of the evidence, must endeavor to arrive at the true motive and cause which prompted the fatal blow. Has there been a former difficulty? What feeling did it produce, and what design did it beget? Was the weapon prepared, and was the blow given coolly and without rage, or was it a sudden and impetuous impulse, causing the act to be committed rashly and without reflection? Were the parties engaged in mutual combat when the blow was given, or was it given when the prisoner was not fighting? Did he use the weapon when he might have avoided it, or was the attack commenced by the deceased, and continued by him until the fatal wound was given? Was the prisoner hemmed in and without means of escape? Was he in danger of life or great bodily harm, and did he give the blow with the knife under the influence of excitement and fear of loss of life, or the infliction of great injury to his person?

Again, the nature of the weapon, and the place and character of the wound, are important to be considered. Was it a deadly instrument, a knife, a dagger, or dirk knife? The deadliness of the weapon tends to indicate the intention with which it is used. The place where the thrust is made also throws light on the intention. If used upon the arms or legs it may indicate only an intention to cut and wound; if used upon a vital part of the body

[Commonwealth *v.* Drum.]

it may indicate an intention to kill. All these are most pertinent inquiries to be made in this case, in order to apply the results drawn from the evidence to the case as presented by each side. This will be seen at once by noting the different aspects in which the case is presented by the Commonwealth and by the defence. On part of the Commonwealth it is alleged that in consequence of previous difficulties between the prisoner and the deceased, the prisoner armed himself with a dirk knife or dagger, intending to use it upon deceased, if they met and had another difficulty; that when they met on Thursday night, after the deceased was struck at over the railing by Robert Miskelly, he turned downward and toward the curb, and was striking at some one there, and not at the prisoner, and while thus engaged, the prisoner, stepping or leaning forward toward him, extended his arm and gave him the thrust in the left side, which was the next to him. In this view of the case, the preparation of the knife, the entire absence of provocation at the time of giving the wound, the deadly nature of the weapon, and the vital part at which the blow was aimed, all tend to prove that the killing was wilful; that there was time to deliberate; that the blow was premeditated; that there was no legal ground of provocation, and no impetuous rage or passion. If you believe this is the true version of the case, then you are asked by the Commonwealth to convict the prisoner of murder in the first degree, on the ground that he killed the deceased wilfully, deliberately and premeditatedly, and with malice aforethought. If you should find this to be so, it would constitute in law murder of the first degree.

But the version of the defence is that the knife was not prepared; that it was one which the prisoner carried and used in his hunting excursions, and that he was preparing to go out upon such an excursion; that the deceased, a large muscular and fighting young fellow, was, in consequence of the former altercation, seeking the prisoner to whip him, of which the prisoner was informed; that, discovering him in the saloon, he came there to do so, and waited near by until he came out, and then returning and finding him standing beside the railing, he attacked him, struck him two blows, was diverted a moment by Riley Miskelly taking hold of him; then, after casting off Riley, and dodging the blow of Robert Miskelly, returned to his assault upon the prisoner, and struck him in the face; that the prisoner then taking out his knife, and before the blow could be repeated by the deceased, cut him in the side, making the wound which caused death, and at the time of doing this, he was so hemmed in he could not escape. If these be the facts—the true version of the case, then the defence ask you to say that the wounding was only in self-defence, demanding a verdict of entire acquittal, and if not in self-defence, that at the very most it is but manslaughter.

[Commonwealth v. Drum.]

To excuse homicide by the plea of self-defence, it must appear that the slayer had no other possible, or at least probable, means of escaping, and that his act was one of necessity. The act of the slayer must be such as is necessary to protect the person from death or great bodily harm; and must not be entirely disproportioned to the assault made upon him. If the slayer use a deadly weapon, and under such circumstances as the slayer must be aware that death will be likely to ensue, the necessity must be great, and must arise from imminent peril of life, or great bodily injury. If there be nothing in the circumstances indicating to the slayer at the time of his act that his assailant is about to take his life, or do him great bodily harm, but his object appears to be only to commit an ordinary assault and battery, it will not excuse a man of equal, or nearly equal strength, in taking his assailant's life with a deadly weapon. In such a case it requires a great disparity of size and strength on part of the slayer, and a very violent assault on part of his assailant, to excuse it. The disparity on the one hand, and the violence on the other, must be such as to convince the jury that great bodily harm, if not death, might have been suffered, unless the slayer had thus defended himself, or that the slayer had a reasonable ground to think it would be so. The burthen lies on the prisoner, in such a case, of proving that there was an actual necessity for taking life, or a seeming one so reasonably apparent and convincing to the slayer, as to lead him to believe he could only defend himself in that way. The jury will remember I am speaking of wilful killing with a deadly weapon. If this intent to kill existed in the mind of the prisoner at the time of giving the blow, two difficulties arise in the case upon the plea of self-defence, which the jury must pass upon and decide. The attack of Mohigan was made with his fists, no weapon appears to have been used by him; the blows appear to have taken no great effect, and at the time Mohigan was alone, while two persons not unfriendly to the prisoner, were interfering on his behalf. Under these circumstances (if you so believe them), was there any real or apparent necessity to take life for the purpose of defence? Did Mohigan do, or try to do, more than beat the prisoner with his fists? Was the disparity of size and strength of the prisoner so great as to require him to take Mohigan's life to prevent great bodily harm to himself, in such a case where no weapon was used against him? The other difficulty arising upon the plea of self-defence, is, whether the prisoner had not an opportunity of escaping down into the saloon, or down street, when Riley Miskelly and Robert Miskelly interfered in his behalf. Taking their testimony, was there anything to prevent his escape when Mohigan was diverted in his attack from him? If you believe Cline, a witness for defence, that Drum had advanced out into the pavement before the entrance to

[Commonwealth v. Drum.]

the saloon, and was no longer hemmed in by the railing; and that Mohigan, after leaving Riley and Robert Miskelly, advanced down the pavement (and the striking downward is corroborated, to some extent, by Stewart), was there anything to prevent Drum's escape? If you think he could readily have escaped without striking the fatal blow; if you think he was not prevented from escaping by the fierceness of the attack, it is not a case of self-defence. The law is too careful of life to permit it to be taken without an excusable necessity.

The next inquiry, and it seems to me the all-important one, is whether the act of the prisoner was manslaughter only. If the prisoner did not meditate the death of Mohigan; if he did not prepare the knife to take his life, and if upon the sudden impulse, arising from the blows he received, and the passion they produced, he drew out his knife in a rage, and gave the fatal blow, it would be manslaughter. Or, if from the suddenness of the attack and an uncontrollable fear seizing him, but without such an excusable necessity as I have described, he drew out the knife and struck the blow without malice, he would be guilty of manslaughter only. Upon this branch of the case I must instruct you that the previous occurrences on Monday night and Thursday night furnished no justification or even excuse to Mohigan in making the attack upon the prisoner on Thursday night at the saloon. This attack constituted a sufficient ground on part of the prisoner to defend himself in a proper manner. But this defence, as I have before said, must not exceed the reasonable bounds of the necessity. Here the jury must attend to this important distinction. The argument of the defence is, that when the slayer is not in fault—is not fighting at the time, or has given up the fight, and then slays his adversary, he is excusable as in self-defence. But though this may be the case, it is not always so. The true criterion of self-defence, in such a case, is, whether there existed such a necessity for killing the adversary as required the slayer to do it in defence of his life or in the preservation of his person from great bodily harm. If a man approaches another with an evident intention of fighting him with his fists only, and where, under the circumstances, nothing would be likely to eventuate from the attack but an ordinary beating, the law cannot recognise the necessity of taking life with a deadly weapon. In such a case it would be manslaughter; and if the deadly weapon was evidently used with a murderous and bad-hearted intent, it would even be murder. But a blow or blows are just cause of provocation, and if the circumstances indicated to the slayer a plain necessity of protecting himself from great bodily injury, he is excusable if he slays his assailant in an honest purpose of saving himself from this great harm.

The right to stand in self-defence without fleeing has been

strongly asserted by the defence. It is certainly true that every citizen may rightfully traverse the street, or may stand in all proper places, and need not flee from every one who chooses to assail him. Without this freedom our liberties would be worthless. But the law does not apply this right to homicide. The question here does not involve the right of merely ordinary defence, or the right to stand wherever he may rightfully be, but it concerns the right of one man to take the life of another. Ordinary defence and the killing of another evidently stand upon different footing. When it comes to a question whether one man shall flee or another shall live, the law decides that the former shall rather flee than that the latter shall die.

But if the prisoner had prepared the knife and intended to use it for the purpose of killing Mohigan, and merely awaited for an assault by him for an occasion to use it, and in consequence of this premeditated design, did use it, it would be murder, and if the act was at the time done with coolness and deliberation, it would be murder in the first degree. If, however, he had no specific intention of taking life, intended not to kill but only to maim and wound, it would be only murder in the second degree. It is the province of the jury to decide upon the credibility of the witnesses, the kind of offence, and, if it is a murder, to ascertain whether it be of the first or second degree. In deciding upon the case, or upon any material part of it, it is the duty of the jury to give the prisoner the benefit of any reasonable doubt arising out of the evidence which prevents them from coming to a satisfactory conclusion. But this doubt must fairly arise out of the evidence, and not be merely fancied or conjured up. A jury must not raise a mere fanciful or ingenious doubt to escape the consequences of an unpleasant verdict. It must be an honest doubt—such a difficulty as fairly strikes a conscientious mind and clouds the judgment. If the mind be fairly satisfied of a fact, on the evidence—as much so as would induce a man of reasonable firmness and judgment to take the fact as true, and to act upon it in a matter of importance to himself, it would be sufficient to rest a verdict upon it. As to whether a reasonable doubt shall establish the existence of a plea of self-defence, I take the law to be this: If there be a reasonable doubt that any offence has been committed by the prisoner, it operates to acquit. But if the evidence clearly establishes the killing by the prisoner purposely, with a deadly weapon, an illegal homicide of some kind is established, and the burthen then falls upon the prisoner, and not on the Commonwealth, to show that it was excusable as an act of self-defence. If, then, his evidence leaves his extenuation in doubt, he cannot be acquitted of all crime, but must be convicted of homicide in some of its grades, of manslaughter at least.

[Commonwealth *v.* Drum.]

Starting, then, with the legal presumption of innocence in favor of the prisoner, until the proof fairly establishes his guilt, the first question to be decided is, whether he is guilty of murder? If he formed the design to kill Mohigan—if, in consequence of this purpose, he prepared or procured a deadly weapon, and carried it about with him to be used when occasion offered itself; and, if when the opportunity arose, he did use it, it would be murder. If at the time he did the act he thought of his purpose to kill him, and had time to think that he would execute it, and formed fully in his mind the conscious design of killing, and had time to think of the weapon he had prepared, and that he would use it, and accordingly so did use it, it would be murder of the first degree. But though he had prepared and carried the weapon, intending to use it, if, at the time the attack was made upon him he had no real intention of killing Mohigan—did not deliberate upon his act—but in the suddenness of the occasion and impetuousness of his temper he intended only to cut, wound or do great bodily harm to him, it would be murder of the second degree only.

But if the weapon was not prepared for the occasion; if the prisoner entertained no previous purpose of killing Mohigan or of doing him great bodily harm; and if, under the impulse of passion, caused by Mohigan's blows, and arising when they were inflicted, the prisoner struck the fatal blow without malice, he is guilty of manslaughter only; even though on the instant and at the suddenness of the provocation he intended to kill Mohigan.

Lastly, if not guilty of manslaughter, was the killing only an act of self-defence? On this subject I have already said enough.

You will now take the case and render such a verdict as the evidence warrants; one which will do justice to the Commonwealth and to the prisoner.