J-A10022-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

COMMONWEALTH OF PENNSYLVANIA : IN THE SUPERIOR COURT OF
: PENNSYLVANIA
Appellant :
:
:
:
v. :
:
:
:
SAYJOUNA VANSYCKEL : No. 1316 EDA 2023

Appeal from the Order Entered April 26, 2023
In the Court of Common Pleas of Philadelphia County
Criminal Division at No(s): MC-51-CR-0005705-2021

BEFORE: LAZARUS, P.J., PANELLA, P.J.E., and BECK, J.

MEMORANDUM BY PANELLA, P.J.E.: **FILED SEPTEMBER 6, 2024**

The Commonwealth appeals from the order entered on April 26, 2023, by the Philadelphia County Court of Common Pleas, denying its motion to refile the charges of third-degree murder, voluntary manslaughter, possessing instruments of crime ("PIC"), tampering with or fabricating physical evidence, and obstructing administration of law or other governmental function against Sayjouna Vansyckel ("Vansyckel").[1] Because we find the Commonwealth presented a *prima facie* case of tampering with or fabricating physical evidence and obstructing administration of law or other governmental function, we affirm in part and reverse in part.

_____

[1] 18 Pa.C.S.A. §§ 2502(c), 2503, 907(a), 4910, and 5101, respectively.

Vansyckel was charged with the above-mentioned crimes, stemming from an incident on March 24, 2021. A preliminary hearing was held at which the Commonwealth presented three witnesses, all police officers. Officer David Jones testified that he responded to 1217 Elbridge Street in Philadelphia at approximately 5:45 p.m. on March 24, 2021. When he arrived in the area of 1217 Elbridge Street, he was flagged down and told that "whatever is going on is going on up the street." N.T. Preliminary Hearing, 3/1/22, at 20. He walked over to that area and a woman said she needed help, and a woman was stabbed. He confirmed the address and called over the radio for rescue to expedite as there were two stabbing victims.

When he first saw the decedent, Taylor Dawson ("Dawson"), she was unconscious on the floor inside 1217 Elbridge Street. Her shirt was pulled up and he observed one stab wound below her left breast. He checked for a pulse but did not find one. When rescue arrived, he carried her to the ambulance to be transported to the hospital. The victim was pronounced dead at 6:09 p.m.

While speaking with Vansyckel, whom he identified as the woman asking for help when he arrived, he noticed she had blood on her face around her nose and lip. Officer Jones was able to identify the second stabbing victim as Vansyckel's mother.[2]

---

[2] Vansyckel's mother was identified by Vansyckel during her interview as Crystal Vansyckel. *See* Recorded Interview, 3/24/21, at 20:08:14-20:09:13.

The Commonwealth next presented Detective John Palmiero. Detective Palmiero interviewed Vansyckel at the Homicide Unit in a room that was both audio and visually recorded. After a lengthy interview, Detective Palmiero typed up a summary of Vansyckel's statement. He presented it to Vansyckel who reviewed it, made handwritten additions,[3] and signed it. Portions of this statement were then read into the record, but pursuant to defense counsel's objections, the statement was ultimately excluded.

Detective Palmiero ended his testimony by noting police searched 1217 Elbridge Street and recovered a knife from the bathroom.

The last witness the Commonwealth presented was Detective Danielle Slobodian. Detective Slobodian explained that during the time Vansyckel was at Homicide headquarters, she escorted Vansyckel to the bathroom. During the walk there, Vansyckel said "I took a life. She is never coming back." N.T. Preliminary Hearing, 3/1/22, at 57. The Commonwealth then rested. Defense

_____

[3] Upon review of the recorded interview, Vansyckel noted multiple corrections to Detective Palmiero. Vansyckel told Detective Palmiero that they spelled Dawson's name incorrectly and had her age wrong. Vansyckel made those two corrections on her own. However, the other two handwritten corrections she refused to write in although requested to do so by Detective Palmiero. Detective Palmiero believed they were important enough to add them in to the statement. Vansyckel did not want to include that Taylor broke in because it was disrespectful to Taylor; specifically, Vansyckel said: "She's dead, that's disrespectful to put any of it in there." She then asked Detective Palmiero if he thinks it should be in there, and he responded that it should be included because Vansyckel said it. Detective Palmiero then wrote in the two handwritten additions on the bottom of the page. **See** Recorded Interview, 3/25/21, at 01:32:22-01:45:15.

did not present any witnesses. After argument, the charges were dismissed for lack of evidence.

The Commonwealth filed a motion to refile the charges and a hearing was held on April 26, 2023. The Commonwealth did not present any additional witnesses. The Commonwealth did, however, enter into evidence the preliminary hearing transcript, the summary of Vansyckel's statement, the recording of Vansyckel's interview, a partial transcript of Vansyckel's interview, and the medical examiner's report.

The two videos comprising Vansyckel's recorded interview span over 18 hours. Over half of the time Vansyckel was alone in the room. The interview began at approximately 8:04 p.m. The transcribed portion of the interview begins at 11:42 p.m. and lasts until 12:11 a.m., when detectives left the interview room. The detectives returned at 1:27 a.m. to read Vansyckel the typed summary of her statement. After the detectives left at 1:45 a.m., Vansyckel was not questioned any further about her involvement in the death of Dawson.

During her interview, Vansyckel provided differing stories of what occurred at her home on March 24, 2021. There are a number of matters she remained consistent on, however, including: she consistently stated Dawson was not permitted in her home, because Vansyckel's mother, with whom Vansyckel lives, believed that Dawson disrespected her home; Vansyckel consistently stated she did not stab her mother and it was not possible she

stabbed her mother; and Vansyckel consistently told the detectives she did not mean to hurt anyone, and she did not know she stabbed Dawson until after Dawson fell to the ground and did not get back up. *See* Recorded Interview, 3/24/21-3/25/21, at 20:11:54-20:12:00, 20:12:12-20:12:54, 22:58:00-22:58:04, 23:15:29-23:15:50, 23:18:44-23:19:18, 23:29:35-23:29:55, 23:30:00-23:30:07, 23:42:33-23:42:50, 23:43:02-23:43:16, 23:48:40-23:48:46, 23:49:09-23:49:54, 23:53:26-23:53:55, 23:55:43-23:56:13, 23:57:02-23:57:59, 23:59:04-23:59:12, 00:03:27-00:04:11, 00:05:49-00:06:01, 00:06:43-00:08:50.

Vansyckel ultimately told detectives what they believed was the truth. Vansyckel explained Dawson was her girlfriend for over a year. That day, Dawson came over due to their recent breakup and started arguing with Vansyckel. Vansyckel was inside the front door and Dawson was just outside the front door. Vansyckel went to close the door, but Dawson pushed it open. Vansyckel tried to call police, but Dawson took her phone and threw it across the street. Dawson left but returned minutes later. Dawson was at the front door trying to get inside as Vansyckel's mother tried to stop Dawson from entering the home. Vansyckel described it as Dawson "broke into" the house. *See* Summary of Interview, 3/25/21 (single page); Recorded Interview, 3/25/21, at 01:32:22-01:45:15. Dawson was screaming. Vansyckel grabbed a knife from the kitchen and started swinging it around in an attempt to scare Dawson. Dawson fell to the ground but got back up, so Vansyckel believed

everything was okay. However, Dawson fell again and did not get back up. Vansyckel's mother told her that she (Vansyckel) had stabbed Dawson. Vansyckel was shaken during the entire interview and consistently said she never meant to hurt anyone.

After both the Commonwealth and defense argued their respective sides, the trial court denied the motion to refile the charges. The Commonwealth timely appealed and complied with the trial court's order to file a Rule 1925(b) statement. *See* Pa.R.A.P. 1925(b).

The Commonwealth raises one issue for our review:

> Did the lower court err in denying the motion to refile charges against [Vansyckel] where the evidence, properly viewed in the light most favorable to the Commonwealth, established a prima facie case that [Vansyckel] committed each of the charged crimes?

Appellant's Brief, at 4.

Our review of an order denying the Commonwealth's motion to refile charges is governed by the following:

> It is well-settled that the evidentiary sufficiency of the Commonwealth's *prima facie* case is a question of law to which this Court's review is plenary. The trial court is afforded no discretion in deciding whether, as a matter of law and in light of the facts presented to it, the Commonwealth has carried its burden to make out the elements of a charged crime.
>
> As our Supreme Court explained:
>
> > at the preliminary hearing stage of a criminal prosecution, the Commonwealth need not prove the defendant's guilty beyond a reasonable doubt, but rather, must merely put forth sufficient evidence of each of the material elements of the crime charged

- 6 -

and establishes probable cause to warrant the belief that the accused committed the offense. Furthermore, the evidence need only be such that, if presented at trial and accepted as true, the judge would be warranted in permitting the case to be decided by the jury.

Weight and credibility of evidence are not factors at the preliminary hearing stage. All evidence must be read in the light most favorable to the Commonwealth, and inferences reasonably drawn therefrom which would support a verdict of guilty are to be given effect. Courts must employ a "more-likely-than-not" test to access the reasonableness of inferences relied upon. Anything less amounts only to suspicion or conjecture.

*Commonwealth v. Munson*, 261 A.3d 530, 540 (Pa. Super. 2021) (citations and brackets omitted).

The "more-likely-than-not" test is a "minimum standard in assessing the reasonableness of inferences relied upon in establishing a *prima facie* case of criminal culpability." *Commonwealth v. Wojdak*, 466 A.2d 991, 996 (Pa. 1983). Our Supreme Court explained "[e]videntiary inferences, like criminal presumptions, are constitutionally infirm unless the inferred fact is more likely than not to flow from the proved fact on which it is made to depend. Where the inference allowed is tenuously connected to the facts proved by the Commonwealth, due process is lacking." *Id.* (citations, internal quotation marks, and emphasis omitted).

Initially, the Commonwealth asserts the trial court erred in finding the elements of third-degree murder, specifically malice, were not established. *See* Appellant's Brief, at 12. The Commonwealth believes it established malice

because "[a] fatal stab wound to the heart gives rise to an inference of malice." *Id.* at 13.

Murder of the third degree is defined as "[a]ll other kinds of murder[;]" i.e. not first- or second-degree murder. 18 Pa.C.S.A. § 2502(c). That is, murder that was not committed intentionally nor while the defendant perpetrated a felony. *See* 18 Pa.C.S.A. § 2502. Third-degree murder requires the Commonwealth to establish the killing was "conducted with malice aforethought." *Commonwealth v. Packer*, 168 A.3d 161, 168 (Pa. 2017) (citations and quotation marks omitted). Our Supreme Court elaborated on the definition of malice:

> The overarching definition of malice was first provided by this Court in *Commonwealth v. Drum*, 58 Pa. 9 (1868):
>
> > It is not malice in its ordinary understanding alone, a particular ill-will, a spite or a grudge. Malice is a legal term, implying much more. It comprehends not only a particular ill-will, but every case where there is wickedness of disposition, hardness of heart, cruelty, recklessness of consequences, and a mind regardless of social duty, although a particular person may not be intended to be injured.
>
> *Id.* at 15. This definition has been continuously repeated and relied upon in decisions by this Court and is incorporated into the Pennsylvania Suggested Standard Criminal Jury Instructions for third-degree murder.
>
> While *Drum*'s definition of malice lacks finite parameters, for the purpose of third-degree murder or aggravated assault, "our courts have consistently held that malice is present under circumstances where a defendant did not have an intent to kill, but nevertheless displayed a conscious disregard for 'an unjustified and extremely high risk that his actions might cause death or serious bodily harm.'"

A killing perpetrated with malice differentiates murder from all other homicides. "[B]etween the recklessness or culpable negligence necessary to support the charge of involuntary manslaughter, and the specific intent to kill which is a prerequisite of murder of the first degree, there is a class of wanton and reckless conduct which manifests such an extreme indifference to the value of human life which transcends the negligent killing and reaches to the level of malice." Therefore, a person who acts negligently or with ordinary recklessness to cause a person to suffer serious bodily injury or death has not committed third-degree murder or aggravated assault, respectively. One legal scholar has defined the point of demarcation for malicious conduct under Pennsylvania law as "dangerousness" – "the … act creates such a dangerous situation" that the resultant deaths or serious bodily injuries "are products of malice." Bruce A. Antkowiak, *The Art of Malice*, 60 Rutgers L. Rev. 435, 471 (2008). As Antkowiak explains, "Malice asks for a solemn, societal judgment about whether [the defendant] was responsible for [a death or serious bodily injury] by bringing about a situation so unnecessarily dangerous to human life that empowering government to exercise its most ominous authority is the only rational societal response."

The quintessential example of the level of recklessness required to constitute malice is a defendant who shoots a gun into a crowd. "If a man fires a gun into a crowd and kills another it is murder, because the fact of the reckless shooting of a gun into a crowd is malice in law. That wicked and depraved disposition and that recklessness and disregard of human life is malice."

*Id.* at 168-69 (brackets and some citations omitted).

The Commonwealth focuses on the fact that a knife was used, and the injuries suffered by the decedent were within vital parts of her body, specifically her chest. *See* Appellant's Brief, at 12-14. Our Supreme Court evaluated the concept of use of a deadly weapon on a vital part of the body in *Commonwealth v. Holt*, 273 A.3d 514, 529 (Pa. 2022). There, our Supreme Court was reviewing the sufficiency of the evidence after a jury found

Holt guilty of first-degree murder and related charges. Our Supreme Court's

explanation of this proposition is enlightening:

> To the extent that the Commonwealth asks the Court to affirm based solely on the fact that Officer Holt was struck in vital parts of his body, we decline to do so. There is no doubt that intentionally striking a vital part of the body with a deadly weapon is, by itself, sufficient for a fact-finder to infer the specific intent to kill. …
>
> We agree that the bullets struck Officer Shaw in vital body parts. … However, this is not a straightforward case like [**Commonwealth v.**] **Rodgers**, [456 A.2d 1352, 1353 (Pa. 1983),] where the "nature of the killing" leaves no room to question whether the actor intentionally aimed the weapon at the victim. The validity of the inference that striking a vital body part with a bullet is sufficient evidence of intent to kill rests on the *intentional use* of the weapon to achieve that result. For example, a person firing a gun blindly through the woods for amusement may strike an unseen hunter in the heart. A rational fact-finder could not conclude that the fact a bullet struck a vital part of the body established a specific intent to kill. In **Commonwealth v. Drum**, 58 Pa. 9 (Pa. 1868), we stated: "He who uses a deadly weapon upon another at some vital part, with manifest intention to use it upon him, must in the absence of qualifying facts be presumed to know that his blow is likely to kill, and must be presumed to intend death." **Id.** at 9.
>
> Thus, the fact that a victim suffered injuries to a vital body part is not dispositive for a sufficiency analysis. There must also be other evidence demonstrating that the shooter manifestly intended to use the weapon upon the victim. Affirming the verdict based solely on the fact that a vital body part was struck would be in dereliction of **Jackson**[ **v. Virginia**, 443 U.S. 307 (1979)] and the Due Process Clause, as we are required to review all the evidence. **See Jackson**, 443 U.S. at 319, 99 S.Ct. 2781 ("Once a defendant has been found guilty of the crime charged, the factfinder's role as weigher of the evidence is preserved through a legal conclusion that upon judicial review all of the evidence is to be considered in the light most favorable to the prosecution."). Holt correctly observes that there is no direct testimony concerning how he deployed his weapon. We therefore decline to

- 10 -

uphold the verdict based solely on the fact that at least one bullet struck a vital body part.

**Holt**, 273 A.3d at 529 (emphasis added; some citations omitted).

The same standard rings true for a *prima facie* case: "the fact that a victim suffered injuries to a vital body part is not dispositive[.]" **Id.** Here, there was no evidence, direct or circumstantial, that would show Vansyckel "manifestly intended to use the weapon upon the victim" and certainly not on a vital part of Dawson's body. **Id.** Rather, the evidence was that the knife was only used as a defensive mechanism when Dawson unlawfully entered Vansyckel's home. Vansyckel admitted to waving a knife around to scare off Dawson, nothing else. She never once admitted to intentionally using the knife to stab Dawson on any part of her body, and no other evidence was produced which established that fact.

We addressed a very similar case in **Commonwealth v. Austin**, 575 A.2d 141 (Pa. Super. 1990). There, the trial court granted Austin's motion to quash charges of murder, voluntary manslaughter, and possessing an instrument of crime, specifically a knife. **Austin**, 575 A.2d at 142. The evidence presented by the Commonwealth was Austin's statement. **Id.** at 142-43. Austin told police:

> [The victim] had something in his hand, but I could not see what it was. I went past him toward Sandy, and then [the victim] hit me in the head with a pipe, or stick or something.
>
> I stumbled and turned around. He came at me, and as he was swinging whatever he had, as he was swinging what it was there he had, I put up my left hand and he hit me. As he was

- 11 -

doing this, I pulled out my knife. I had it in my hand, and I swung the knife at him swinging (indicating an upward motion from the waist). And if I thought about it twice, I was swinging again, but I changed my mind, because he was on the defense now.

*Id.* at 143. Austin then left, but before he did, he saw the victim laying on the ground. We held that:

The evidence presented at the preliminary hearing does not support the Commonwealth's position. Austin admitted he intentionally pulled out his knife. Austin then stated that, "I swung the knife at him swinging (indicating an upward motion from the waist). And if I thought about it twice, I was swinging again…." The Commonwealth construes this evidence to indicate that Austin's focus was on plunging the knife into the victim, from which it can be inferred that Austin intended to kill the victim. The evidence, however, supports the position that Austin's focus was on swinging the knife and not on stabbing the victim.

The Commonwealth's argument centers on the use of the knife itself to cause the death; however, the physical act of using the knife on a vital area is not the proper focus. The proper focus for determining the mental component of the crime is how appellant intended to use the knife or what caused the knife to come into contact with a vital area of a human body. A specific intent to kill and malice are properly implied when a deadly weapon is *directed* to a vital part of the body. In other words, what did Austin intend to do with the knife: was it his intention to put the knife into the victim or was it his intention to do something else.

In the case before the bar, the preliminary hearing judge had to determine from the evidence what Austin's intentions were up to and including the moment of the knife's contact with victim. There is no evidence that the knife was directed at a vital part of the victim's body. Austin admitted to swinging the knife and the Commonwealth presented no other evidence concerning this issue. The judge found that Austin did not intend to direct the knife into victim's body. We agree.

*Id.* at 144-45. This Court then held that the evidence did not support a *prima facie* case of either first- or third-degree murder and affirmed the order quashing the charges. *Id.* at 145.

The same applies here: the evidence presented by the Commonwealth does not include any "evidence that the knife was directed at a vital part of the victim's body. [Vansyckel] admitted to swinging the knife and the Commonwealth presented no other evidence concerning this issue." *Id.* Therefore, the Commonwealth did not present a *prima facie* case of malice required for third-degree murder.

Next, the Commonwealth asserts it presented a *prima facie* case for voluntary manslaughter. The Commonwealth argues that Vansyckel unreasonably believed she needed the knife to protect herself. *See* Appellant's Brief, at 15-16. Just as with the charge of third-degree murder, the Commonwealth did not present any evidence of the required *mens rea*.

Voluntary manslaughter is defined as:

(a) General rule.—A person who kills an individual without lawful justification commits voluntary manslaughter if at the time of the killing he is acting under a sudden and intense passion resulting from serious provocation by:

(1) the individual killed; or

(2) another whom the actor endeavors to kill, but he negligently or accidentally causes the death of the individual killed.

(b) Unreasonable belief killing justifiable.—A person who intentionally or knowingly kills an individual commits voluntary manslaughter if at the time of the killing he believes the

- 13 -

circumstances to be such that, if they existed, would justify the killing under Chapter 5 of this title (relating to general principles of justification), but his belief is unreasonable.

18 Pa.C.S.A. § 2503(a)-(b). "Voluntary manslaughter contemplates an intentional killing wherein the defendant harbors a specific intent to kill or cause serious injury." ***Commonwealth v. Patton***, 936 A.2d 1170, 1178 (Pa. Super. 2007) (citations omitted).

The Commonwealth did not present any evidence that Vansyckel knowingly or intentionally killed Dawson. In fact, the evidence presented by the Commonwealth indicates that Vansyckel did not know she stabbed Dawson until after Dawson fell to the ground a second time, did not get up, and Vansyckel's mother told her that she had stabbed Dawson. ***See*** Summary of Interview, 3/25/21 (single page); Recorded Interview, 3/24/21, at 23:43:02-23:43:16, 23:57:02-23:57:59. Vansyckel, during her interview, told detectives she never intended to hurt anyone. ***See*** Recorded Interview, 3/24/21-3/25/21, at 22:58:00-22:58:04, 23:30:00-23:30:07, 23:42:33-23:42:50, 23:48:40-23:48:46, 23:55:43-23:56:13, 23:59:04-23:59:12, 00:03:27-00:04:11. The Commonwealth's evidence shows at most an accidental or unintentional killing. That does not support a charge of voluntary manslaughter.

Next, the Commonwealth asserts it presented a *prima facie* case of possessing instruments of crime because "the surrounding circumstances

allowed the inference of [Vansyckel's] intent to employ the knife criminally." Appellant's Brief, at 17. We disagree.

In relevant part, possessing instruments of crime ("PIC"), as codified at 18 Pa.C.S.A. § 907(a), states that "[a] person commits a misdemeanor of the first degree if he possesses any instrument of crime with intent to employ it criminally." 18 Pa.C.S.A. § 907(a). "Instrument of crime" is defined as "[a]nything specially made or specially adapted for criminal use[, or] [a]nything used for criminal purposes and possessed by the actor under circumstances not manifestly appropriate for lawful uses it may have." 18 Pa.C.S.A. § 907(d).

"[T]he offense requires proof of possession of such instrument, coupled with the intention to employ it criminally." **Commonwealth v. Andrews**, 768 A.2d 309, 313 (Pa. 2001) (citation omitted). "The actor's criminal purpose provides the touchstone of liability for the PIC offense, and such purpose may be inferred from the circumstances surrounding the possession." **Commonwealth v. Brockington**, 230 A.3d 1209, 1213 (Pa. Super. 2020) (internal quotation marks, ellipsis, brackets, and citation omitted). Here, it is conceded that Vansyckel possessed a knife. **See** Appellee's Brief, at 17. Therefore, we must determine if the knife was either specially made or adapted for criminal use or possessed under circumstances not manifestly appropriate for lawful uses, and whether Vansyckel had the intent to employ the knife criminally.

The evidence presented shows the knife came from Vansyckel's kitchen. *See* Summary of Interview, 3/25/21 (single page). A kitchen knife certainly is not specially made or adapted for criminal use. Therefore, we need to determine if the evidence established that the knife was possessed by Vansyckel under circumstances not manifestly appropriate for lawful uses. The only evidence presented at the preliminary hearing established that Vansyckel grabbed the knife with the intent to scare Dawson. *See* Summary of Interview, 3/25/21 (single page). We find that the Commonwealth has not established Vansyckel possessed the knife under circumstances not manifestly appropriate for lawful uses as she merely used the knife to scare Dawson after Dawson unlawfully entered her home.

Furthermore, the Commonwealth did not establish a criminal intent in Vansyckel's actions to scare Dawson, as Dawson had unlawfully entered Vansyckel's home when she was not welcome. Further, Dawson was screaming and yelling at the time she entered, and Vansyckel's mother was trying to stop Dawson from entering. Vansyckel repeatedly emphasized that she did not mean to hurt anyone. *See* Recorded Interview, 3/24/21-3/25/21, at 22:58:00-22:58:04, 23:30:00-23:30:07, 23:42:33-23:42:50, 23:48:40-23:48:46, 23:55:43-23:56:13, 23:59:04-23:59:12, 00:03:27-00:04:11. The Commonwealth did not present any other testimony or evidence to establish a criminal intent behind Vansyckel's use of the knife. The Commonwealth simply relies on the fact that Vansyckel admitted to swinging the knife and

Dawson was stabbed multiple times in her torso. *See* Appellant's Brief, at 18. We find that the Commonwealth's inference of Vansyckel's criminal intent does not meet the more-likely-than-not test as it is just as likely her intention was non-criminal in nature. *See Wojdak*, 466 A.2d at 996 (finding evidentiary inferences infirm unless the inferred fact is more likely than not to flow from the proven fact). Therefore, the Commonwealth did not establish a *prima facie* case of possessing instruments of crime.

Next, the Commonwealth asserts it made out a *prima facie* case of tampering with or fabricating physical evidence. The Commonwealth claims that Vansyckel's "attempt to conceal the knife from the police allowed the reasonable inference that she did so with the intent to limit the availability of the knife in any proceeding or investigation." Appellant's Brief, at 19. We agree.

Tampering with or fabricating physical evidence, in relevant part, is defined as:

> A person commits a misdemeanor of the second degree if, believing that an official proceeding or investigation is pending or about to be instituted, he:
>
> > (1) alters, destroys, conceals or removes any record, document or thing with intent to impair its verity or availability in such proceeding or investigation[.]

18 Pa.C.S.A. § 4910(1).

The evidence presented by the Commonwealth at the preliminary hearing was that a knife was recovered from the bathroom. *See* N.T.

Preliminary Hearing, 3/1/22, at 36. At the re-file hearing, the Commonwealth entered into evidence Vansyckel's statement in which she admitted to hiding the knife. **See** Recorded Interview, 3/24/21, at 23:33:29-23:33:33; Summary of Interview, 3/25/21 (single page). The summary of her interview notes that Vansyckel hid the knife in the bathroom *after* the police arrived at her home. **See** Summary of Interview, 3/25/21 (single page); Recorded Interview, 3/25/21, at 01:45:09-01:46:00 (Vansyckel reviews summary, agrees it is truthful, and signs it).

Vansyckel asserts the Commonwealth did not prove she hid the knife with the intent to impair its verity or availability in the subsequent investigation. **See** Appellee's Brief, at 17. However, the fact Vansyckel hid the knife in the bathroom *after* police arrived creates the reasonable inference that Vansyckel only did so to prevent the police from locating the knife during their investigation.

We find **Commonwealth v. Toomer**, 159 A.3d 956 (Pa. Super. 2017), instructive in this regard. In that case, Toomer was driving his own vehicle behind the vehicle of his friend, Jason Rowe. **See Toomer**, 159 A.3d at 958. Toomer's wife was a passenger in his vehicle. **See id.** Toomer's wife realized she left her firearms in Rowe's vehicle. **See id.** Toomer called Rowe on his cell phone and asked Rowe to pull over to the side of the road. **See id.** Toomer went to obtain the firearms and during the exchange, a firearm discharged, hitting Rowe. **See id.** Toomer told his wife to take Rowe to the hospital in

- 18 -

Rowe's vehicle. *See id.* She complied and drove off toward the hospital. *See id.* After she drove away, Toomer realized he had her firearms. *See id.* Toomer was not licensed to carry firearms, so he decided to take the firearms back to his apartment. *See id.* at 958-59. Toomer left the firearms at his apartment. *See id.* at 959.

The police interviewed Toomer after they were notified of the shooting. *See id.* Toomer initially lied to police, stating that his wife had been retrieving the firearm when it discharged and hit Rowe. *See id.* Police searched the couple's apartment and located the firearms; one on the kitchen counter and the other on top of the refrigerator. *See id.* Toomer was charged with and convicted of carrying a firearm without a license and tampering with or fabricating physical evidence. *See id.* at 958. On appeal, Toomer averred that the Commonwealth did not present sufficient evidence for his conviction of tampering with or fabricating physical evidence. *See id.* at 960. We held:

> As to the element of intent, Toomer argues that he neither was aware of a police investigation, nor intended to impair it by concealing evidence. However, based upon the totality of the circumstances, a jury could have reasonably believed that Toomer knew the police would immediately begin investigating Rowe's shooting once he appeared at the hospital with a gunshot wound. The jury could also have reasonably inferred that, knowing a police investigation would ensue, Toomer decided to dispose of the weapons in an attempt to conceal his involvement in Rowe's shooting. Such an inference is particularly reasonable in light of Detective Jensen's testimony that Toomer initially lied and told him that Angelic had been in possession of the firearm when it discharged.

*Id.* at 962.

Here, Vansyckel hid the knife after police arrived at her home. It is reasonable to infer she knew an investigation was pending, or certainly about to be immediately instituted. The Commonwealth's inference she hid the knife with the intent to impair its verity or availability in the investigation is reasonable and passes the more-likely-than-not test. *See Wojdak*, 466 A.2d at 996. Therefore, we find that the Commonwealth has presented a *prima facie* case of tampering with or fabricating physical evidence.

Finally, the Commonwealth argues it established a *prima facie* case of obstructing administration of law or other governmental function.

> A person commits a misdemeanor of the second degree if he intentionally obstructs, impairs or perverts the administration of law or other governmental function by force, violence, physical interference or obstacle, breach of fiduciary duty, or any other unlawful act, except that this section does not apply to flight by a person charged with crime, refusal to submit to arrest, failure to perform a legal duty other than an official duty, or any other means of avoiding compliance with law without affirmative interference with governmental functions.

18 Pa.C.S.A. § 5101. Obstructing administration of law was derived from Section 242.1 of the Model Penal Code and was "designed to cover a broad range of behavior that impedes or defeats the operation of government." *Commonwealth v. Palchanes*, 224 A.3d 58, 60 (Pa. Super. 2019) (citation omitted). "The interference need not involve physical contact with the government official as he performs his duties." *Commonwealth v. Johnson*, 100 A.3d 207, 215 (Pa. Super. 2014) (citations omitted). "This provision is intended to reach those who take the initiative in throwing the police off track."

***Commonwealth v. Feese***, 79 A.3d 1101, 1125 (Pa. Super. 2013) (citation omitted).

The Commonwealth asserts that Vansyckel's unlawful act of hiding the knife in the bathroom, i.e. tampering with evidence, gives rise to the inference that she intentionally impaired the administration of law. ***See*** Appellant's Brief, at 19-20. We agree. The Commonwealth presented a *prima facie* case of tampering with or fabricating physical evidence through Vansyckel's act of hiding the knife after police arrived at her home. ***See Commonwealth v. Williams***, 302 A.3d 1238, 1248 (Pa. Super. 2023) (en banc), *appeal granted*, 315 A.3d 841 (Pa. 2024) (affirming the holding that the unlawful act element "can only be satisfied by allegations setting forth a violation of codified law.") (citation omitted). Because Vansyckel hid the knife after police arrived at her home, it can be inferred that she did so with the intent to impair the investigation, i.e. the administration of law.

Therefore, we agree with the trial court the Commonwealth failed to present a *prima facie* case of third-degree murder, voluntary manslaughter, and possessing instruments of crime. As to those three charges, we affirm the trial court's order denying the Commonwealth's motion to refile charges. However, we find that the Commonwealth did present a *prima facie* case of tampering with or fabricating physical evidence and obstructing administration of law or other governmental function. As to those two charges, we reverse

the trial court's order and remand for proceedings consistent with this memorandum.

Order affirmed in part and reversed in part. Case remanded for further proceedings. Jurisdiction relinquished.

PJ Lazarus joins the memorandum.

Judge Beck files a concurring and dissenting memorandum.

Judgment Entered.

*Benjamin D. Kohler*

Benjamin D. Kohler, Esq.
Prothonotary

Date: 9/6/2024