## Commonwealth *v.* Joseph Aiello, Appellant.

*Criminal law—Murder—Premeditation—Evidence.*

If sufficient time be afforded to enable the mind fully to frame the design to kill, and to select the instrument, it is premeditated. The law fixes upon no length of time as necessary to form the intention to kill, but leaves the existence of a fully formed intent as a fact to be determined by the jury from all the facts and circumstances in the evidence.

On the trial of an indictment for murder, the evidence tended to show that on the morning of the day on which the killing occurred the deceased had engaged in one or two fights, and the prisoner had interfered to prevent his getting hurt. Shortly afterwards the deceased struck at the prisoner, but the prisoner refused to fight, and the parties then separated. The deceased then went to the prisoner's house while he was absent, roughly handled the prisoner's young son, struck a visitor and barely missed striking the prisoner's wife. He then went back to his own house and assumed a position in front of his door. The prisoner after an absence of about one hour and a half, and after he had heard what had occurred at his own house, approached the deceased, drew a knife, struck at him, and when he retreated into his house, the prisoner followed and stabbed him with the knife. The prisoner then fled and concealed himself. *Held*, that the evidence was sufficient to sustain a conviction of murder in the first degree.

Argued March. 22, 1897. Appeal, No. 55, Oct. T., 1897, by defendant, from judgment of O. and T., Jefferson Co., Dec. T., 1896, No. 4, on indictment for murder. Before GREEN, WILLIAMS, MITCHELL, DEAN and FELL, JJ. Affirmed.

Indictment for murder. Before REED, P. J.,

The facts are stated by REED, P. J., on a motion for a new trial as follows :

. The testimony shows that Louis Scalzi, the deceased, and four others occupied one side of a double house, and the defendant, Joseph Aiello, and family, occupied the other side. The deceased, with others, had been invited to take his Christmas dinner with the defendant. He had been drinking during the forenoon, and was very quarrelsome. He had engaged in one or two fights, and the defendant had interfered to prevent his getting hurt. This friendly interference by the defendant seemed to anger him, and when the defendant told him to come to dinner, instead of doing so, he went up stairs and in a few minutes returned with a pair of large shears, and then made an assault upon the defendant, striking at him with the shears. The defendant declined to be drawn into a fight at that time, stating that he had a wife and children dependent upon him and could not afford to fight. The parties then separated. The defendant went to a little place called Shantytown, in the immediate vicinity, and Scalzi went to the water closet where he remained for about an hour. When he came out of the closet he went to the defendant's house, and in going in he caught hold of the defendant's little boy who was standing in the doorway and threw him aside, making him cry. Finding a man by the name of Mike Carino in there talking to the defendant's wife, he inquired for his hat and without further ceremony struck Carino on the head with a pick handle, and in this act very nearly struck Mrs. Aiello. He then went to Shantytown to find his hat, but returned in a few minutes without it and took a position alongside of the door leading into his own house. He stood there leaning against the side of the house with his legs crossed, and with one hand in his pocket and with the other hand extended, kept shaking it at those around him saying, more than one will have to cry for this, referring no doubt to his prior troubles. He had been standing there talking in this maudlin way for perhaps fifteen or twenty minutes when the defendant, after an absence of about an hour and a half, returned from Shantytown. There seems to be some conflict in the testimony at this point. Some of the witnesses apparently testifying that the defendant, on his return from Shantytown, came directly up to where Scalzi was standing, while others testify that he

went to his own house first.  Upon the whole testimony we think it is clear that the defendant at least was told what Scalzi had done in his absence before he went to talk to him.  The defendant, who, according to his own testimony, had just avoided coming in contact with Scalzi because he was angry, now sought him for a personal interview regarding his conduct during his absence from home.  He alleges that his purpose was to pacify him, but from what followed, we cannot escape the conviction that his real object in approaching the deceased was the seeking of an opportunity for carrying into execution a formed design and purpose to kill him.  The fact that the deceased, by his conduct in the forenoon, had interfered with the enjoyment of the dinner party planned for the day, and had made an assault upon the defendant with a pair of shears no doubt was rankling in the bosom of the defendant, and when he was told what the deceased had done in his absence, the homicidal purpose and the plan of executing it, as revealed in his subsequent conduct, were quickly formed.  All this is indicated by the remarks he addressed to the deceased, and the readiness with which he produced the knife used in striking the fatal blows.  The deceased was unarmed, and his position, leaning against the house with his legs crossed and one hand in his pocket, was not that of a combatant.  Accepting the defendant's version of the transaction, there was nothing in what the deceased said or did that afforded the slightest excuse or even pretense for the defendant making such a violent and deadly assault upon him.  The defendant tells a very improbable story, and one that is in conflict with the testimony of the disinterested witnesses, when he testifies that the deceased with his right hand in his pocket caught him by the lapel of the coat with his left hand and pulled him inside the house, and then finding himself unable to get the hand of the deceased out of his pocket he took a knife from the dining table and began striking him with it.  The defendant shows by his own testimony that he had the free use of both his hands, while both hands of the deceased were engaged, and there was nothing to interfere with defendant knocking the deceased down with his fist, and thereby freeing himself from his grasp.  This would have been the natural as well as the probable act of any man placed in such a position, if his only object was to get away or to release himself from the grasp of

his assailant. The commonwealth's witnesses, however, present the transaction in a different light. From their testimony it appears that the defendant had the knife concealed somewhere about his person, and that he began to strike with it at the door, and when the deceased retreated into the room of his own house the defendant followed, and struck him with the knife. The witness, Angelo Brascal, testified that the defendant said: "Don't you want to quit and behave yourself," and the deceased then threw up his hands, and the defendant said "he would make him quit." The testimony of this witness and that of his brother, Salvatore Brascal, indicate that the deceased threw up his hands as if to ward off a blow from the defendant, and we think it is a legitimate inference from the facts and circumstances in evidence that the defendant had the knife in his hand at that time, and that deceased saw it, which was the occasion of his throwing up his hands and backing into the room. Both these witnesses testify that the defendant struck the deceased with the knife at or about the time he threw up his hands. That he was struck when he was backing away from the defendant is shown by the testimony of Salvatore Brascal and Samuel Matthews. The injuries thus inflicted by the defendant proved speedily fatal, and his statement that "he would make him quit" was verified. That the defendant was conscious of his guilt in this transaction is evidenced by his request made immediately after to Angelo Sonnata to look after and care for his children, and the fact that he then fled the country.

The court charged in part as follows:

[It would appear from the evidence in this case that the deceased had been quarreling and acting badly on the forenoon of the day on which he was killed, and perhaps up to an hour or two before his death, and that he had made some threats as to what he was going to do or what was likely to happen, but, if he had quieted down and was not disturbing any one at the time the defendant approached him, and if he committed no overt act at that time to cause a man of ordinary courage and prudence to believe that he was in imminent danger of his life or great bodily harm, the defendant would not be excused on the ground of self defense for killing him. The prior quarrels

and difficulties and the previous general bad conduct of the deceased, including any threats he may have made, are not important or material in determining the issue in this case except in so far as they may have inspired the defendant with fear or made him apprehensive that the deceased would do him some grievous injury, and was likely to prepare himself for that purpose.] [1] In this aspect, all that occurred that day as shown in the evidence is to be considered with what was said and done at and immediately before the defendant struck the fatal blow, as bearing upon the question of whether or not the defendant at that time had reasonable grounds for believing that he was in imminent danger from the deceased, and that the act in taking the life of the deceased was necessary to avoid death or great bodily harm which was apparently imminent.

[If Louis Scalzi, the deceased, did not, at, or immediately before, the defendant struck him and inflicted the injuries causing his death, commit some overt act, or make some demonstration indicative of an intention to take the life of the defendant or to do him some grievous bodily harm, then what transpired or occurred previously would be of no consequence. It is only important and material, as we have already said, when considered in connection with what took place at the time of the killing.] [2] Therefore you will closely scrutinize and carefully consider the testimony, both on the part of the commonwealth and on the part of the defendant, as to what was said and done by the deceased at and immediately before the fatal conflict between him and the defendant, and whether the conduct and actions of the deceased, viewed in the light of what had been previously said and done that day, afforded the defendant reasonable grounds for believing that he was in imminent peril of life or great bodily harm, and that it was necessary for him to make use of a deadly weapon in the manner that he did to protect himself against such apparent imminent danger. If it does, then the act of the defendant would be excusable on the ground of self defense, otherwise it would not be excusable or justifiable.

Defendant's points and answers thereto were as follows :

6. That if the defendant from his knowledge of the character of the deceased and of his reputation as being a dangerous man, and taking into consideration the disparity of size and physical strength between the deceased and the defendant, and if the

defendant believed he was in great danger of bodily harm, and the deceased was making an aggressive movement toward the defendant, he was justified in taking the life. of his assailant, and if the jury so find their verdict should be not guilty. *Answer:* This point as stated is refused. We do not recall any evidence that the deceased had the reputation of being a dangerous man; nor do we recall any evidence of such an aggressive movement by the deceased towards the defendant as would give a man of ordinary courage and prudence reasonable ground for believing that he was in imminent danger of life or great bodily harm. But this is a matter for the jury, and if you recall any such evidence given on the trial, or are satisfied from all the evidence in the case that the defendant had reasonable grounds for believing that his life was in peril or that he was in danger of great bodily harm from the deceased, and that his act in taking the life of the deceased was necessary to avert such peril or danger or that it appeared so to the defendant, then the defendant's acts would be excusable under the law of self defense and a verdict of acquittal should follow. [3]

7. That if the jury find from the evidence in this case that the defendant had previously and up to the time of slaying of the deceased, Louis Scalzi, defended the deceased and used all his best efforts to protect the deceased from quarreling, and was befriending him, and that after so befriending him, the deceased became angry at and made threats against the defendant, and entered defendant's house, making an assault upon defendant's wife and child, and struck Michael Carino, who was a guest of the defendant, on the head with a pick handle, and when the defendant went up to the deceased to ask him why he had attacked his wife and child and why he didn't quit quarreling and behave himself, the deceased then made threats and became aggressive towards the defendant, and, after entering the house of the deceased, defendant was attacked by the deceased, and in passing a table he picked up a knife and struck the deceased, and that in striking with the knife he had reason to believe that his life was in danger, or that he was in great danger of bodily harm, then such striking would be justified and the verdict of the jury should be not guilty. *Answer:* This point as a whole is refused. The fact that the defendant may have befriended the deceased, or that the deceased had

made an assault upon the defendant's wife and child and had struck Mike Carino over the head with a pick handle, did not constitute the defendant the keeper or judge of the deceased, much less his executioner. We have said several times, and now repeat it, that if the defendant at the time he struck the fatal blow had reason to believe that his life was in danger or that the deceased was about to inflict upon him great bodily harm, then such striking would be justifiable and a verdict of acquittal should follow. [4]

8. That if the jury find from the evidence that the defendant had acted as the friend of the deceased and had used his best efforts to prevent the deceased from quarreling, and that up to the time of the slaying, defendant had tried to reason with the deceased, then there is no such evidence of malice as would justify a verdict of murder in the first degree, and if the jury so find their verdict should be not guilty as to murder in the first degree. *Answer :* We cannot affirm this point. Whether the defendant was actuated by malice or not, is a question for the jury, and we leave it to you under the evidence. [5]

Verdict of guilty of murder of the first degree, upon which sentence was passed.

*Errors assigned* were (1–5) above instructions, quoting them; (6) that the charge was inadequate in that it did not instruct the jury upon every question of law legitimately raised by the evidence.

*H. Clay Campbell*, with him *W. M. Fairman* and *C. Mitchell*, for appellant.—When death ensues from the use of a deadly weapon, in a quarrel or affray, the jury must scan closely the conduct of both of the parties, their former relations and behavior, and the current of events ; the character of the weapon, the manner of its use, and the circumstances attending it; and by a careful survey of the evidence must endeavor to arrive at the true motive and cause which prompted the fatal blow : Com. v. Drum, 58 Pa. 9.

While it is not in all cases necessary to answer specifically every one of a series of points, it is necessary to instruct the jury upon the legal rule controlling the questions suggested by the points : Stewart v. Com., 29 Pa. 429 ; Huddleston v. West

Bellevue Borough, 111 Pa. 110; Duncan v. Sherman, 121 Pa. 520; People's Savings Bank v. Denig, 131 Pa. 241; Meyers v. Com., 83 Pa. 131.

*N. L. Strong,* district attorney, *Jacob L. Fisher, R. C. Winslow* and *J. E. Calderwood,* for appellee, were not heard, but argued in their printed brief.—The bad character of the deceased for turbulence and violence is competent in favor of the accused only when the conduct of the deceased, at the time of the killing, was such as to create a reasonable apprehension of great bodily harm: Lang v. State, 84 Ala. 1; 5 Am. St. Rep. 324; Walker v. State, 28 Tex. App., 503; Thomas v. People, 67 N. Y. 218; State v. Birdwell, 36 La. Ann. 859; People v. Stock, 1 Idaho, 218; Doyal v. State, 70 Ga. 134; Binfield v. State, 15 Neb. 484; State v. Ford, 37 La. Ann. 443; Grainger v. State, 5 Yerg. (Tenn.) 459; Copeland v. State, 7 Humph. 479; Rippy v. State, 2 Head, 219; Williams v. State, 3 Heisk. 393; State v. Hall, 9 Nev. 58; 6 Lawson's Crim. Defenses, 22; Horbach v. State, 43 Tex. 242; 2 Bishop on Crim. Proc. sec. 619; State v. Thompson, 83 Mo. 257; Rauck v. State, 110 Ind. 384; Harrison v. State, 24 Ala. 67; State v. Sullivan, 51 Iowa, 142; State v. Jefferson, 43 La. Ann. 995; King v. State, 65 Miss. 576; 1 Russell on Crimes, *715; Com. v. Eckerd, 174 Pa. 137.

There was no error in the charge: Meyers v. Com., 83 Pa. 131; Com. v. Boschino, 176 Pa. 115; McMeen v. Com., 114 Pa. 301; Abernethy v. Com., 101 Pa. 322; McClain v. Com., 110 Pa. 263; Lanahan v. Com., 84 Pa. 80; Cathcart v. Com., 37 Pa. 108; Com. v. Buccieri, 153 Pa. 541; Com. v. Breyessee, 160 Pa. 451.

OPINION BY MR. JUSTICE MITCHELL, April 12, 1897:

There is nothing in this record or the assignments of error that would justify the reversal of this judgment. The law was fully and accurately explained in the charge, the evidence contained all the elements of murder of the first degree, and the jury have found the appellant guilty. It is true that the conduct of the deceased had been violent and perhaps dangerous during the morning, and had the killing been done then there would have been sufficient evidence to justify the jury in find-

ing a lower degree of homicide.    But all this was past.    Time, variously stated at from one to two hours, had elapsed during which the appellant had eaten his dinner, gone to a neighbor's house where there was music, and then returned home.    What he there heard of the deceased's actions while he was away, was not sufficient to justify an attack by the appellant upon him.    The provocation which will operate to reduce the grade of killing must be immediate, and the killing done before time to cool.    In view of the lapse of time and the affirmative testimony of the appellant himself, not only of time to cool, but of the actual diversion of thought by intervening matters, it would have been error for the judge to have submitted the events of the morning to the jury as evidence from which they might find the killing to be less than murder of the first degree.    He did submit them fully and carefully on the question of self defense, and the appellant's reason to apprehend serious danger to himself when he struck the fatal blows.    That was the only point on which they were relevant.

In regard to premeditation, while the law was correctly laid down by Justice AGNEW in the case relied on by appellant, Com. v. Drum, 58 Pa. 9, that it is incumbent on the commonwealth, when claiming anything higher than second degree, " to satisfy the jury of those facts and circumstances which indicate the deliberate intention to kill, and the cool depravity of heart and conscious purpose which constitute the crime of murder of the first degree," yet it is also said in the same case, " if sufficient time be afforded to enable the mind fully to frame the design to kill, and to select the instrument, or frame the plan to carry this design into execution, it is premeditated.    The law fixes upon no length of time as necessary to form the intention to kill, but leaves the existence of a fully formed intent as a fact to be determined by the jury from all the facts and circumstances in the evidence."    As already said the evidence in the present case was enough to justify the jury in finding all the elements of murder of the first degree.

The fact that appellant during the morning had acted as a friend of the deceased and tried to prevent his being hurt in his quarrels with others, was a circumstance to disprove malice and was submitted to the jury with the other evidence, but it was not a rebuttal of malice as a matter of law, and it would

have been error to affirm the appellant's point to that effect. There was evidence in appellant's acts and declarations immediately after the killing, in his flight and concealment, etc., to sustain the commonwealth's theory that although he had been friendly to the deceased at first he afterwards lost patience and determined to "settle him" in the way he did. It was through no error of the judge that the jury adopted this view.

Judgment affirmed and record remitted to the court below for purposes of execution.