**IN THE SUPREME COURT OF PENNSYLVANIA**
**MIDDLE DISTRICT**

**TODD, C.J., DONOHUE, DOUGHERTY, WECHT, MUNDY, BROBSON, McCAFFERY, JJ.**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : | No. 1 MAP 2025 |
| | : | |
| Appellee | : | Appeal from the Order of the |
| | : | Superior Court at No. 2591 EDA |
| | : | 2021, entered on August 7, 2024, |
| v. | : | Affirming the Judgment of Sentence |
| | : | of the Bucks County Court of |
| | : | Common Pleas, Criminal Division, |
| KEVIN R. PETERS, | : | at No. CP-09-CR-0003901-2020, |
| | : | entered on October 15, 2021. |
| Appellant | : | |
| | : | ARGUED: November 18, 2025 |

**OPINION**

**JUSTICE DOUGHERTY**                    **DECIDED: May 4, 2026**

Appellant Kevin Peters killed two people, and seriously injured two others, while driving under the influence of alcohol (DUI). He was convicted, *inter alia*, of two counts each of third-degree murder and aggravated assault, crimes requiring the element of malice. We granted discretionary review to consider the standard for malice in the context of DUI. Peters claims this Court's precedent created a DUI-specific standard for malice, requiring proof that death or serious bodily injury is not just likely, but "essentially certain to occur." *See* Peters's Brief at 18-19, *quoting Commonwealth v. O'Hanlon*, 653 A.2d 616, 618 (Pa. 1995), and *Commonwealth v. Packer*, 168 A.3d 161, 170 (Pa. 2017). We disagree. Regardless of the particular circumstances of the crime — whether it involved DUI, a shooting, or some other conduct — the standard for malice remains the same. Malice is present if the defendant consciously disregarded an unjustified and extremely

high risk that his actions might cause death or serious bodily injury. The facts here readily satisfied this standard. Peters drank heavily for hours, raised his blood alcohol content to almost twice the legal limit, turned down an offer for a ride home, broke his car out of a parking garage, drove recklessly on an actively used highway, sped at well over 100 miles per hour, looked away from the road as he searched for his phone, and crashed into the rear of a car driving in the righthand lane with its emergency lights activated, causing the other vehicle to collide with a concrete wall and burst into flames. Accordingly, we affirm the order of the Superior Court, which affirmed Peters's judgment of sentence.

## I. Background

On December 5, 2019, Peters attended an office holiday party at Ruth's Chris Steak House in Philadelphia. The open bar event started at 5:00 p.m. and was held in a private room. Peters drank vodka. When the event ended, around 8:00 p.m., Peters and his co-workers moved to the public bar at Ruth's Chris, where Peters drank bourbon.

Around 10:00 p.m., as the group was getting ready to leave, a co-worker, Jacquelyn Smith, offered Peters and others a ride home. Peters declined. Instead, he asked Smith to drop him and another co-worker at a nearby bar called Rogue's Gallery. Video surveillance footage from Rogue's Gallery showed Peters drinking beer there until midnight, when Peters chugged the rest of his beer and left the bar.

Although Peters ordinarily took the train to work, he had driven to work that day in his Mazda SUV. Surveillance footage from the parking garage shows it took Peters several minutes to operate the payment kiosk. Next, Peters had trouble exiting the garage. He approached one of the exit lanes but then reversed and drove to the other lane. For unknown reasons, the mechanical arm blocking the exit did not move. Undeterred, Peters reversed again, got out of his car, and manually lifted one of the

mechanical arms high enough to allow his car through, breaking the mechanical arm in the process. He returned to his car and drove off, leaving the visibly-broken mechanical arm dangling in his wake. When Peters reached the end of the exit ramp, the garage door began to lift, but Peters's car did not sit still. His car repeatedly shifted backward and forward while he waited.

Out of the garage, Peters rolled through a stop sign and then drove to and entered Interstate 95 ("I-95"), the primary north-south highway on the East Coast of the United States. Video surveillance footage from the highway showed Peters straddling the fog line at one point and exiting in New Jersey without using a turn signal. However, Peters immediately changed course, driving back onto the highway to return to Pennsylvania. His driving was so erratic that two people called 911. One caller, Nicholas Hafto, reported he was driving on I-95 when a Mazda passed by at a high rate of speed and nearly sideswiped Hafto's car. Hafto slowed down to keep his distance from the Mazda, but noticed the Mazda was randomly changing speeds — shifting between speeds much faster or much slower than the speed limit. Then the Mazda exited the highway in New Jersey. According to Hafto, the Mazda exited so "abrupt[ly]" that its driver had to slam the brakes, and Hafto thought for a moment that the Mazda was "going to hit the exit[.]" N.T. Trial, 9/13/21, at 140-41.

Scott Emrick also called 911 and reported a Mazda was "swerving left and right." Trial Court Op. at 1 (unpaginated), *quoting* Ex. C-3. According to Emrick, the Mazda's speed was "erratic[,] . . . [t]he headlights were turned off,"[1] and the Mazda made "a very sharp exit" off I-95. N.T. Trial, 9/14/21, at 7, 10. In addition, an ambulance driver,

---

[1] After the crash, an expert examined the Mazda and confirmed the automatic headlight switch in the Mazda was turned on. However, for unknown reasons, the Mazda's taillights were off. The police could not test the lights due to the car's extensive damage, but surveillance footage of the Mazda showed its headlights on and taillights off.

Edmonde Sestini, Jr., was driving approximately 60 miles per hour on I-95 when a Mazda "came flying past [him.]" N.T. Trial, 9/13/21, at 127.

At approximately 1:00 a.m., Juan Tavarez was driving home from work on I-95 with his co-worker, Claribel Dominguez, and sons, Charlys and Juan Jose Tavarez Santelises ("Charlys" and "Juan Jose"). Because of a slight whistle coming from his car, Tavarez was driving at, or just below, the 55-mile-per-hour speed limit, with his flashers on, in the righthand lane. Peters crashed into the back of Tavarez's car. Tavarez later said it "felt like a bomb went [off.]" N.T. Trial, 9/14/21, at 134. Tavarez's car crashed into a concrete wall and was soon engulfed in flames. Tavarez and Charlys were able to escape the burning car; Juan Jose and Dominguez were not. First responders could not get near the car to assist the victims or retrieve their bodies until the fire was out. A medical examiner later determined Juan Jose and Dominguez both died from thermal burns. The surviving victims each suffered serious burns and injuries.

Peters had to be removed from his car and dragged to safety. Testing revealed his blood alcohol content ("BAC") was .151,[2] nearly double the legal limit.[3]

Corporal Brianne Glad, an accident reconstruction expert, examined data from the Mazda's "black box," which revealed Peters had been driving 113 miles per hour five

---

[2] Donna Papsun, a toxicology expert, later testified at Peters's trial that a person with a BAC of .151 would not be capable of safe driving, as they can experience "increased diminishment of attention, judgment, [and] control[,]" as well as "some incoordination, delayed perception, delayed information processing, delayed decision-making, and . . . delayed reaction time[.]" N.T. Trial, 9/15/21, at 148-49. As an example of this delayed perception, Papsun said a person fiddling with their radio "may not realize how long [they] are fiddling around[.]" Id. at 151.

[3] "An individual may not drive, operate or be in actual physical control of the movement of a vehicle after imbibing a sufficient amount of alcohol such that the alcohol concentration in the individual's blood or breath is at least 0.08%[.]" 75 Pa.C.S. §3802(a)(2).

seconds before the crash,[4] with his seatbelt unbuckled. Peters had been using 83 percent of throttle, meaning he had "pushed down [the pedal] to a decent extent to get those speeds." N.T. Trial, 9/15/21, at 88. Half a second before the crash, Peters accelerated to 115 miles per hour — more than double the 55-mile-per-hour speed limit. He pressed the brake, at most, four-tenths of a second before the crash.[5] Corporal Glad also determined "[n]o roadway issues or deformations were located at the scene that would have caused or contributed to this collision." *Id.* at 96.

At Peters's jury trial, he testified he had driven to work that day because he had to drop off his daughter at daycare. Since his wife also planned to attend an office holiday party that night, and would be staying overnight at a friend's house in Philadelphia after the event, Peters had arranged for their daughter to stay overnight in New Jersey at his mother-in-law's house.[6] Peters confirmed he had multiple drinks over the course of the night, but "felt fine to drive." N.T. Trial, 9/16/21, at 78. Instead, he blamed his early problems at the parking garage on his inexperience driving to work. *See id.* at 74 (explaining he had to go "back [to the payment kiosk] to get [his] actual credit card receipt so [he] could expense it"); *id.* at 76 ("I had never parked in that garage before, so I was probably a little confused on . . . which gate to go out"). When the mechanical arm wouldn't rise, Peters "th[ought he] tried to call for help . . . and there was no response," so he resorted to force because he "didn't want to leave [his] car" in the garage. *Id*. Once

---

[4] Corporal Glad testified that the industry standard leaves a four-mile-per-hour margin of error, meaning the slowest Peters could have been driving at the five-second-mark was 109 miles per hour.

[5] The Mazda's black box records data in half-second intervals, so Corporal Glad testified that Peters pressed the brake "between zero and .4 seconds prior to the crash[.]" N.T. Trial, 9/15/21, at 91.

[6] Peters's wife and mother-in-law also took the stand and gave similar accounts. Additionally, Peters presented five friends or family members as character witnesses.

on the highway, he claimed he drove "the speed limit so that [he] wouldn't attract any attention[,]" and sped up only "to pass other cars." *Id.* at 78.

According to Peters, he had originally intended to drive to his mother-in-law's house in New Jersey and spend the night there. However, he called his mother-in-law and didn't receive a response. Only when he was exiting the highway did he decide he did not want to risk waking his family, so he turned around and drove back towards his home in Pennsylvania. But Peters missed his exit.[7] According to Peters, he decided to check the GPS on his phone to find "a quick way to either turn back around or just go home from the next exit[.]" *Id.* at 81. But the phone was in Peters's backpack on the passenger side floor. Peters testified he "thought it would be okay to reach down for a moment[,]" so he unbuckled his seatbelt and started rummaging for his phone. *Id.* at 91. When he glanced up and saw the victim's car, Peters "tried to turn the wheel and hit the brakes[,]" but couldn't avoid the crash. *Id.* at 82.

On September 17, 2021, the jury found Peters guilty of fourteen offenses, including two counts each of third-degree murder and aggravated assault.[8] The trial court separately convicted Peters of two counts of DUI and four summary offenses.[9] The court later sentenced Peters to an aggregate term of 19 ½ to 39 years in prison. Peters appealed.

---

[7] Peters was not new to the area. He had lived in Bucks County for six years.

[8] The jury also found Peters guilty of two counts each of homicide by vehicle while DUI, aggravated assault by vehicle while DUI, homicide by vehicle, aggravated assault by vehicle, and recklessly endangering another person.

[9] Specifically, driving within a single lane, following too closely, driving a vehicle at a safe speed, and reckless driving.

A divided, *en banc* panel of the Superior Court affirmed the judgment of sentence in an opinion authored by Judge Murray.[10]  *See Commonwealth v. Peters*, 320 A.3d 1231 (Pa. Super. 2024) (*en banc*).  Relying heavily on *Packer*, the five-judge majority concluded the evidence was sufficient to prove Peters acted with malice.  According to the majority, "the *Packer* Court observed that 'an impaired driver who causes the death of another does not typically act with the requisite malice to support convictions of third-degree murder and aggravated assault.'"  *Id.* at 1237, *quoting Packer*, 168 A.3d at 166.  Rather, the majority noted that *Packer* held:

> [M]alice is present under circumstances where a defendant did not have an intent to kill, but nevertheless displayed a conscious disregard for an unjustified and extremely high risk that his actions might cause death or serious bodily harm.

*Id.* at 1238, *quoting Packer*, 168 A.3d at 168.  The majority explained that, under *Packer*, malice "requires a higher degree of culpability" than "mere recklessness"; it "entails 'an element of deliberation or conscious disregard of danger.'"  *Id.*, *quoting Packer*, 168 A.3d at 170.  This means

> the offensive act must be performed under circumstances which almost assure that injury or death will ensue.  The recklessness must, therefore, be such that life threatening injury is essentially certain to occur.  This state of mind is, accordingly, equivalent to that which seeks to cause injury.

*Id.*, *quoting Packer*, 168 A.3d at 170 (emphasis omitted).  Thus, the majority said, "the requisite *mens rea* is only met in circumstances where 'the defendant could reasonably anticipate that serious bodily injury or death would be the likely and logical consequence of his actions . . . [but] the consequence was ignored.'"  *Id.*, *quoting Packer*, 168 A.3d at 170.  The majority noted "the totality of the evidence was sufficient" to prove malice in *Packer* as the defendant there "knew from warning labels that [the aerosol she huffed]

---

[10] Then-President Judge Panella and Judges Stabile, Nichols, and King joined the majority opinion.

was not intended to be ingested" and "had a known history of becoming unconscious from huffing." *Id.*, *quoting Packer*, 168 A.3d at 171 (emphasis omitted).

Although "[t]his case is factually distinct from *Packer*," the majority concluded, "like *Packer*, . . . '[t]his is not a typical case of ordinary recklessness that arises when someone chooses to drive while intoxicated.'" *Id.* at 1241, *quoting Packer*, 168 A.3d at 171. Instead, "[Peters] maliciously exhibited **sustained** recklessness over a considerable period of time prior to the fatal crash, despite an obvious risk of harm to other motorists and the general public." *Id.* at 1243, *citing Commonwealth v. Kling*, 731 A.2d 145, 149 (Pa. Super. 1999) (some emphasis omitted).[11] The majority explained:

> [Peters], after drinking to excess over several hours, attempted to exit his parking garage, but could not operate the garage's payment machine. [Peters] then damaged the gate when he forcibly opened it to exit. [Peters's] difficulties in exiting the garage certainly alerted him that he was too intoxicated to drive safely. Yet he was not deterred.
>
> After [Peters] began driving, numerous instances alerted him that continuing to drive, while significantly impaired, posed an extremely high and unjustifiable risk to others. Indeed, [Peters] violated numerous traffic laws, drove recklessly for nearly an hour before the collision, and narrowly avoided hitting two other motorists on I-95 (prompting both motorists to call 911 to report [Peters's] hazardous driving). [Peters] twice missed his intended exit on I-95, despite having lived in the area for six years. Immediately before the collision, the intoxicated [Peters] admittedly took his eyes off the road while driving over 100 mph, and reached over to the passenger-side floorboard to retrieve his phone.

---

[11] In *Kling*, the Superior Court held "a conviction based on malice is appropriate where evidence demonstrates the element of **sustained recklessness** by a driver in the face of an **obvious risk of harm** to his victims." *Kling*, 731 A.2d at 149, *citing Commonwealth v. Comer*, 716 A.2d 593, 597 (Pa. 1998) (emphasis in original). Like Peters, Kling was convicted of third-degree murder and related offenses after he struck another car. Before the crash, Kling had been racing down a curvy mountain road he had driven on before. He "passed five cautionary signs warning him to slow down around the treacherous curves[,]" and "nearly hit [a motorist] driving in the opposite lane of travel[,]" all of which "warned [Kling] his conduct was nearly certain to result in a serious or fatal disaster." *Id.* at 150.

*Id.* (citations and emphasis omitted). "Under the totality of the circumstances," the majority determined "the evidence was sufficient to demonstrate [Peters] 'displayed a conscious disregard for an unjustified and extremely high risk that his actions might cause death or serious bodily harm.'" *Id.*, *quoting Packer*, 168 A.3d at 168.[12]

Then-Judge, now President Judge Lazarus, dissented.[13] Most notably, the dissent disagreed with the majority's definition of malice. The dissent concluded "[i]t is insufficient to prove that someone's bad decisions **could have, may have,** or **likely would** result in death or serious bodily injury." *Id.* at 1252 (Lazarus, J., dissenting), *citing Packer*, *supra*, and *O'Hanlon*, *supra* (emphasis in original). Rather, in the dissent's view, "malice, in the DUI context, requires that the recklessness exhibited must involve an awareness that the conduct is **essentially certain** to cause the death or serious bodily injury." *Id.*, *citing Packer*, *supra*, and *O'Hanlon*, *supra* (emphasis in original).

Turning to the present facts, the dissent concluded "the Commonwealth failed to present sufficient evidence of the 'warning' requirement of malice necessary for third-degree murder and aggravated assault in the DUI context." *Id.* at 1253. In the dissent's view, "Peters'[s] inability to operate the parking garage kiosks is not a 'warning' contemplated by our case law." *Id.* The dissent also noted "the record is silent on whether Peters had a history of drunk driving." *Id.* *See also id.* (rejecting the Commonwealth's suggestion that "'every adult' knows the dangers of alcohol" as "driving

---

[12] The majority distinguished *Comer*, 716 A.2d at 597 (finding insufficient evidence of malice where Comer was driving drunk when "his car rubbed the curb of the sidewalk and the accident ensued immediately thereafter"). "Unlike *Comer*," the majority explained, "the crash here did not ensue immediately after the driver became aware of his life-threatening conduct. To the contrary, [Peters]," like the offender in *Kling*, "had adequate time to calculate and reflect upon the consequences of his reckless conduct, thus rendering the choice to continue it malicious." *Peters*, 320 A.3d at 1241, *quoting Kling*, 731 A.2d at 150 (emphasis omitted).

[13] Judges Dubow, Kunselman, and McLaughlin joined the dissent.

while intoxicated by itself does not create the requisite malice"). The dissent dismissed the 911 calls as "meaningless" because "[n]either of those phone calls communicated the warning to Peters himself," *id.*, and deemed "Smith's offer of a ride home" immaterial, *see id.* at 1254 ("she offered a ride to every co-worker at the party" and "did not caution Peters that he had consumed too much alcohol or warn him not to drive") (emphasis omitted). The dissent also opined "Peters'[s] decision to drive his vehicle instead of taking a train or taxi, and to use a highway rather than a local road, is of no moment" as "the mere decision to drive intoxicated does not satisfy the malice requirement." *Id.* at 1252.

On the other hand, the dissent found Peters's application of the brakes shortly before the crash to militate against a finding of malice. In the dissent's view, this fact "tends to show that he was trying to avoid a collision," and broke any "chain of 'sustained recklessness.'" *Id.* at 1255 (citations and emphasis omitted).[14] Therefore, the dissent insisted the Commonwealth presented insufficient evidence to prove malice.

Four of the five judges in the majority joined a separate concurring opinion, authored by Judge Stabile, addressing issues raised by the dissent. To start, the concurrence "disagree[d] that [*Packer*] supports the [d]issent's position." *Id.* at 1244 (Stabile, J., concurring). According to the concurrence, "*Packer* explained that 'our courts have **consistently** held that malice is present under circumstances where a defendant did not have an intent to kill, but nevertheless displayed a conscious disregard for an

_____

[14] The dissent disagreed with the majority's reliance on *Kling*. Unlike Kling, the dissent says, Peters "was reported driving at speeds both below and above the posted speed limit; was seen exiting the highway safely; and, both Hafto and Emrick reported driving in a way to avoid Peters." *Peters*, 320 A.3d at 1256. Thus, in the dissent's view, Peters did not demonstrate the "sustained recklessness" at issue in *Kling*. *Id.* Rather, the dissent believed Peters's case was more similar to the Superior Court's decision in *Commonwealth v. Dellavecchia*, 725 A.2d 186, 188-89 (Pa. Super. 1998) (concluding the evidence was insufficient to prove malice where Dellavecchia, with a blood-alcohol level of .033%, "drove at an excessive rate of speed," and "cut off other cars[,]" but applied brakes before his car crashed "in an effort to avoid impact").

unjustified and extremely high risk that his actions **might cause** death or serious bodily harm.'" *Id., quoting Packer*, 168 A.3d at 168 (emphasis supplied by the concurrence). Although *Packer* also used the "essentially certain" language emphasized by the dissent, the concurrence argued "this was not the final word in *Packer*." *Id.* at 1245. Rather, *Packer* "went on to describe malice as a state of mind in which 'the defendant could reasonably anticipate that serious bodily injury or death would be the likely and logical consequence of his actions . . . [but] the consequence was ignored.'" *Id., quoting Packer*, 168 A.3d at 170. Then, "[a]t the conclusion of the opinion, when issuing its holding, the *Packer* Court again repeated the malice standard as requiring a conscious disregard for the risks of conduct that 'might cause a death or serious personal injury.'" *Id., quoting Packer*, 168 A.3d at 172. "Accordingly," in the concurrence's view, the *Packer* Court did not have "any intention of applying a more exacting standard for malice as stated by the [d]issent here." *Id.*

Next, the concurrence argued the dissent erred "in interpreting our precedent to require that advance 'warning' or 'notice' must have been given to [Peters] prior to the accident in order for a finding of malice to be made." *Id.* at 1246. According to the concurrence, "if a defendant receives a 'warning' about the risks of his conduct[,]" then that evidence may certainly be probative of malice. *Id.* at 1247. However, in the concurrence's view, "that is far different than a judicial rule that prohibits a finding of malice where the defendant did not receive warning from a third-party regarding the risks of his conduct. As such a rule would depart from our established precedent and constitute judicial fact-finding," the concurrence opined "it was properly rejected by the [m]ajority." *Id.* (emphasis omitted). *See also id.* at 1249 ("Drunk driving is so inherently dangerous that its deadly consequences cannot reasonably come as a surprise to those who

knowingly expose others to that risk."), *citing O'Hanlon*, 653 A.2d at 618-19 (Papadakos, J., dissenting).[15]

Finally, the concurrence opined that the dissent had "usurped the role of the fact-finder by drawing inferences in [Peters's] favor[.]" *Id.* at 1247. For instance, the concurrence argued "the jury was entitled to consider th[e] evidence [of Peters's braking] in a more culpable light" than the one drawn by the dissent. *Id.* In the concurrence's view, "it was just as probable that [Peters] touched the brake pedal inadvertently while reaching for his phone on the floor of his vehicle." *Id.* at 1248. Regardless, it would have been "impossible for nearly any driver to maintain control" at Peters's speeds, so the concurrence concluded "[t]he jury was in no way bound to find a lack of malice simply because [Peters] made, at most, a token effort to avert disaster." *Id.*

We granted discretionary review to consider the following questions, as stated by Peters:

1. This Court has expressly held that the malice standard for drunk driving homicides and assaults is "recklessness . . . such that life threatening injury is essentially certain to occur. This state of mind is, accordingly, equivalent to that which seeks to cause injury." [*Packer*, 168 A.3d at 170.] Did the Superior Court majority err when it rejected that holding and approved and applied a lesser standard, to wit "a conscious disregard for an unjustified and extremely high risk" of death or serious injury?

2. Under the proper standard set forth in *Packer*, was the evidence insufficient to prove malice?

*Commonwealth v. Peters*, 332 A.3d 27 (Pa. 2025) (*per curiam*) (emphasis omitted).

---

[15] The concurrence also disagreed with the dissent's "statement that [Peters's] life-threatening decisions leading up to the accident were irrelevant to the issue of malice." *Id.* at 1245-46 (emphasis omitted). Although Peters's decision to drive while intoxicated, standing alone, could not prove malice, the concurrence believed "its contribution to the totality of the facts in a case may lend itself to such a finding." *Id.* at 1246.

## II. Discussion

The meaning of "malice" for purposes of the crimes of third-degree murder and aggravated assault is a question of law. As such, our standard of review is *de novo* and our scope of review is plenary with respect to this issue. Likewise, "[e]videntiary sufficiency is a question of law and, therefore, our standard of review is *de novo* and our scope of review is plenary." *Commonwealth v. Chisebwe*, 310 A.3d 262, 267 (Pa. 2024), *quoting Commonwealth v. Smith*, 234 A.3d 576, 581 (Pa. 2020).

The principles governing sufficiency review are well-established:

> In conducting sufficiency review, we consider whether the evidence introduced at trial and all reasonable inferences derived therefrom, viewed in the light most favorable to the Commonwealth as verdict winner, are sufficient to establish the elements of the offense beyond a reasonable doubt. Our review does not involve reweighing the evidence and substituting our judgment for that of the fact-finder. In addition, the facts and circumstances need not be absolutely incompatible with the defendant's innocence; rather, the question of any doubt is for the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact can be drawn from the combined circumstances.

*Id.* at 268 (internal quotations and citations omitted).

### A. Malice

### 1. Parties' Arguments

To start, Peters claims the majority applied the wrong standard for malice. He contends the "historic definition" of malice "for non-DUI offenses" provides that "'malice is present under circumstances where a defendant did not have an intent to kill, but nevertheless displayed a conscious disregard for an unjustified and extremely high risk that his actions might cause death or serious bodily harm.'" Peters's Brief at 19 n.3, *quoting Packer*, 168 A.3d at 168. However, Peters claims our decision in *O'Hanlon* established a different "standard for malice in the context of impaired drunk driving assaults[.]" *Id.* at 18 (brackets omitted). There, by Peters's reading, we held malice is

present in a DUI-related case only if "life threatening injury is essentially certain to occur." *Id.*, *quoting O'Hanlon*, 653 A.2d at 618.

Peters claims this Court "reaffirmed" this "DUI-specific" standard for malice twenty years later in *Packer. Id.* According to Peters, "the *Packer* Court expressly adopted and applied *O'Hanlon*, again stating that" malice requires proof "life threatening injury is essentially certain to occur." *Id.* at 19, *quoting Packer*, 168 A.3d at 170. Although "the Superior Court majority [here] . . . quot[ed] the 'essentially certain to occur' language" from *O'Hanlon* and *Packer*, Peters claims the majority erred in failing to apply that standard. *Id.* at 20. Instead, the majority "rel[ied] on the more general malice language from *Packer* that[,]" in Peters's view, applies only to "non-DUI" crimes. *Id.*

The Commonwealth, on the other hand, argues this Court "did not establish two separate standards of malice[.]" Commonwealth's Brief at 14. Rather, this Court held *Packer* "is one of the few [DUI] cases that meets **the standard** of **malice**." *Id.* at 21, *quoting Packer*, 168 A.3d at 172 (emphasis supplied by the Commonwealth). The Commonwealth reads this language as describing a single standard for malice, regardless of whether or not the crime involves DUI. *See id.* at 26 ("th[e] historical discussion by the Court in *Packer* discussed only the single standard of malice, because there is only one standard") (emphasis omitted).[16] According to the Commonwealth, in cherry-picking only "a single sentence" from *Packer*, Peters ignores its "ultimate holding," which said: "[t]he standard for malice, enunciated in [*Commonwealth v. Drum*, 58 Pa. 9 (1868)], reiterated in *O'Hanlon* and reaffirmed today requires recklessness of consequences and the conscious disregard for an unjustified and extremely high risk that

---

[16] The Commonwealth also argues that creating separate standards for malice would be inconsistent with the plain text of the third-degree murder and aggravated assault statutes, neither of which include any language specific to DUI. *See* Commonwealth's Brief at 22 ("The crimes are not named Third-Degree Murder — DUI Crash or Aggravated Assault — DUI Crash").

a chosen course of conduct might cause a death or serious personal injury.'" *Id.* at 17, *quoting Packer*, 168 A.3d at 172 (emphasis and footnote omitted). This Court recited that same standard, the Commonwealth says, "in finding the defendant in *Packer* acted with malice[.]" *Id.* at 18, *quoting Packer*, 168 A.3d at 171 ("Packer consciously disregarded an unjustified and extremely high risk that her chosen course of conduct might cause a death or serious bodily injury.") (emphasis omitted). Thus, in the Commonwealth's view, Peters is arguing that "a single line of *Packer* . . . upended" more than a century of "precedence to create a new and separate definition of malice for only certain circumstances (DUI related cases)," and yet this Court ended the opinion by **not** applying "this newly developed standard[.]" *Id.* at 27.

Although the Commonwealth acknowledges *Packer* included the "'essentially certain' phrasing," the Commonwealth claims the language "that immediately follows" is "detrimental to [Peters's] claim[.]" *Id.* at 18-19, *quoting Packer*, 168 A.3d at 170 ("The *O'Hanlon* Court found that the requisite *mens rea* is only met in circumstances where 'the defendant could reasonably anticipate that serious bodily injury or death would be the likely and logical consequence of his actions . . . [but] the consequence was ignored.'"). Therefore, the Commonwealth argues, the Superior Court majority properly interpreted *Packer* as affirming the single, "unwavering standard of malice[.]" *Id.* at 19.

In reply, Peters argues "the 'essentially certain to occur' threshold was core to the holding [of *Packer*, so] the words are not *dicta*, must have meaning, and must be applied in future cases." Reply Brief at 2. According to Peters, "[t]he *Packer* Court used 'DUI context'" as a caption "for the entirety of its analysis, one that expressly applies [to] the 'essentially certain to occur' standard[.]" *Id.* at 5, *quoting Packer*, 168 A.3d at 170 ("**In the DUI context**, this Court has held that the decision to drive while under the influence

of alcohol and/or a controlled substance does not, standing alone, constitute malice.") (emphasis supplied by Peters).

## 2. Analysis

There are three degrees of murder under Pennsylvania law. First-degree murder is a murder "committed by an intentional killing." 18 Pa.C.S. §2502(a). Second-degree murder is a murder "committed while [the] defendant was engaged as a principal or an accomplice in the perpetration of a felony." 18 Pa.C.S. §2502(b).[17] Third-degree murder, the degree of murder for which Peters was convicted, is defined by exclusion as "[a]ll other kinds of murder[.]" 18 Pa.C.S. §2502(c). This means "[t]hird-degree murder is a killing with malice that is not intentional" or committed in perpetration of a felony. *Commonwealth v. Yard*, 323 A.3d 762, 765 n.4 (Pa. 2024). A person is guilty of aggravated assault, the other crime at issue here, if he "attempts to cause serious bodily injury to another, or causes such injury intentionally, knowingly or recklessly under circumstances manifesting extreme indifference to the value of human life[.]" 18 Pa.C.S. §2702(a)(1).[18] Crucially, "the *mens rea* required for a conviction of aggravated assault, like third-degree murder, is malice; only the result of the crimes differ." *Packer*, 168 A.3d at 168, *citing O'Hanlon*, 653 A.2d at 618 ("Aggravated assault is, indeed, the functional equivalent of a murder in which, for some reason, death fails to occur."), and *Kling*, 731

---

[17] "Perpetration of a felony" is defined as "[t]he act of the defendant in engaging in or being an accomplice in the commission of, or an attempt to commit, or flight after committing, or attempting to commit robbery, rape, or deviate sexual intercourse by force or threat of force, arson, burglary or kidnapping." 18 Pa.C.S. §2502(d).

[18] "A person acts recklessly with respect to a material element of an offense when he consciously disregards a substantial and unjustifiable risk that the material element exists or will result from his conduct. The risk must be of such a nature and degree that, considering the nature and intent of the actor's conduct and the circumstances known to him, its disregard involves a gross deviation from the standard of conduct that a reasonable person would observe in the actor's situation." 18 Pa.C.S. §302(b)(3).

A.2d at 147 ("There is no distinction between the malice essential to third[-]degree murder and that necessary for aggravated assault.").

This appeal asks us to clarify the definition of malice in the context of DUI. This Court "first provided" an "overarching definition of malice" in *Drum*. *Packer*, 168 A.3d at 168. There, this Court explained:

> [I]t is not malice in its ordinary understanding alone, a particular ill-will, a spite or a grudge. Malice is a legal term, implying much more. It comprehends not only a particular ill-will, but every case where there is wickedness of disposition, hardness of heart, cruelty, recklessness of consequences, and a mind regardless of social duty, although a particular person may not be intended to be injured.

*Drum*, 58 Pa. at 15.[19]

More recently, in *Commonwealth v. Taylor*, 337 A.2d 545 (Pa. 1975), this Court explicated *Drum*'s broad definition of malice. In *Taylor*, which was also a murder case arising from drunk driving, a four-Justice majority of the Court determined Taylor "consciously disregarded an unjustified and extremely high risk that his actions might cause death or serious bodily harm to another, and therefore acted maliciously." 337 A.2d at 549 (Roberts, J., concurring, joined by Jones, C.J., and Eagen and Manderino, JJ.), *citing* Wayne R. LaFave & Austin Scott, Handbook on Criminal Law, §70 (1972). That is, a majority of the *Taylor* Court endorsed the view that malice is present if the defendant consciously disregarded an unjustified and extremely high risk that his actions might cause death or serious bodily harm. In the more than half century since *Taylor*, this

---

[19] *Accord, e.g.*, *Packer*, 168 A.3d at 168; *Commonwealth v. Fisher*, 80 A.3d 1186, 1191 (Pa. 2013); *Commonwealth v. Santos*, 876 A.2d 360, 363 (Pa. 2005); *Commonwealth v. Ludwig*, 874 A.2d 623, 632 (Pa. 2005); *Commonwealth v. Thomas*, 594 A.2d 300, 301 (Pa. 1991); *Commonwealth v. McGuire*, 409 A.2d 313, 316 (Pa. 1979); *Commonwealth v. McLaughlin*, 142 A. 213, 215 (Pa. 1928).

Court has repeatedly approved this formulation of the malice standard.[20] The Superior

Court has also time and again endorsed this definition of malice.[21] Based on this ample

---

[20] *See Packer*, 168 A.3d at 168 ("[O]ur courts have consistently held that malice is present under circumstances where a defendant did not have an intent to kill, but nevertheless displayed a conscious disregard for an unjustified and extremely high risk that his actions might cause death or serious bodily harm.") (quotation marks and citation omitted); *id.* at 172 ("The standard for malice . . . reaffirmed today requires recklessness of consequences and the conscious disregard for an unjustified and extremely high risk that a chosen course of conduct might cause a death or serious personal injury."); *Commonwealth v. Roebuck*, 32 A.3d 613, 615 n.4 (Pa. 2011) ("[M]alice is present under circumstances where a defendant did not have an intent to kill, but nevertheless displayed a conscious disregard for an unjustified and extremely high risk that his actions might cause death or serious bodily injury.") (quotation marks, citations, and emphasis omitted); *Santos*, 876 A.2d at 364 ("Viewing this evidence in the light most favorable to the Commonwealth as we must when reviewing a trial court's order granting a petition for habeas corpus, the Commonwealth clearly presented sufficient evidence to support a *prima facie* finding that Santos consciously disregarded an unjustified and extremely high risk that his actions might cause death or serious bodily injury.") (quotation marks and citations omitted); *Ludwig*, 874 A.2d at 632 ("Malice . . . may be found to exist not only in an intentional killing, but also in an unintentional homicide where the perpetrator consciously disregarded an unjustified and extremely high risk that his actions might cause death or serious bodily harm.") (quotation marks, citations, and emphasis omitted); *Commonwealth v. Overby*, 836 A.2d 20, 24 (Pa. 2003) (approving jury charge defining malice as "[a] conscious disregard of an unjustified and extremely high risk that his action might cause death or serious bodily harm"); *Commonwealth v. Young*, 431 A.2d 230, 232 (Pa. 1981) ("[M]alice may be found to exist not only in an intentional killing, but also in an unintentional homicide where the perpetrator consciously disregarded an unjustified and extremely high risk that his actions might cause death or serious bodily harm.") (quotation marks and citation omitted); *Commonwealth v. Hare*, 404 A.2d 388, 391 (Pa. 1979) ("Malice will be found if the actor committed a killing with an intent to kill or to inflict serious bodily harm, or consciously disregarded an unjustified and extremely high risk that his actions might cause death or serious bodily harm.") (citations omitted); *Commonwealth v. Garcia*, 378 A.2d 1199, 1206 (Pa. 1977) ("Malice may . . . be found if, in killing another, the defendant consciously disregarded an unjustified and extremely high risk that his actions might cause death or serious bodily harm[.]") (quotation marks and citations omitted); *In re Klein's Estate*, 378 A.2d 1182, 1186 n.21 (Pa. 1977) ("Malice may also be found even if the killing was not intentional, where the perpetrator consciously disregarded an unjustified and extremely high risk that his actions might cause death or serious bodily harm[.]") (quotation marks and citations omitted).

[21] *See, e.g.*, *Commonwealth v. Vansyckel*, 341 A.3d 174, 180 (Pa. Super. 2025) (*en banc*) ("Where malice is based on a reckless disregard of consequences, it must be shown that the defendant consciously disregarded an unjustified and extremely high risk that [her] (continued…)

precedent, involving both DUI and non-DUI cases alike, the standard for malice in Pennsylvania is clear and identical across all types of cases: malice exists if the defendant consciously disregarded an unjustified and extremely high risk that his actions might cause death or serious bodily harm.

Contrary to Peters's claims, *O'Hanlon* did not deviate from *Taylor* and its many progeny and adopt "a distinct malice standard, one beyond that for other forms of malice murder, in the DUI context." Reply Brief at 4. In *O'Hanlon*, the appellant was "driving while inebriated, [and] ran a red light and struck another vehicle, seriously injuring both the other driver and himself." 653 A.2d at 616. He was convicted of aggravated assault and reckless endangerment. The Superior Court concluded "[O'Hanlon]'s initial act of driving while intoxicated was . . . sufficient to render him criminally culpable, since such behavior is a gross deviation from the standard of care a reasonable person would observe." *Id.* at 617. This Court "granted allocatur to determine the *mens rea* of recklessness necessary to establish aggravated assault." *Id*. The Court found that the Superior Court failed to account for "the increased degree of recklessness required by the aggravated assault statute, that is, recklessness 'under circumstances manifesting

___

actions might cause death or serious bodily injury[.]") (citation omitted); *Commonwealth v. Knox*, 219 A.3d 186, 195 (Pa. Super. 2019) ("A fact-finder may find malice not only in an intentional killing, but also in an unintentional homicide where the perpetrator consciously disregarded an unjustified and extremely high risk that his actions might cause death or serious bodily injury.") (quotation marks and citation omitted); *Commonwealth v. Akhmedov*, 216 A.3d 307, 322 (Pa. Super. 2019) (*en banc*) ("Malice may be found where the actor consciously disregards an unjustified and extremely high risk that the actor's conduct might cause death or serious bodily injury.") (quotation marks and citation omitted); *Commonwealth v. King*, 990 A.2d 1172, 1177 (Pa. Super. 2010) (same); *Commonwealth v. Geiger*, 944 A.2d 85, 90 (Pa. Super. 2008) ("[M]alice may be found where the defendant has consciously disregarded an unjustified and extremely high risk that her conduct might cause death or serious injury to another."); *Commonwealth v. Scales*, 648 A.2d 1205, 1207 (Pa. Super. 1994) ("A finding of malice based on a recklessness of consequences requires that a defendant be found to have consciously disregarded an unjustified and extremely high risk that his actions might cause death or serious bodily injury.") (quotation marks and citation omitted).

extreme indifference to the value of human life.'" *Id.*, *citing* 18 Pa.C.S. §2702(a)(1). The *O'Hanlon* Court elaborated:

> [M]ere recklessness is insufficient to support a conviction for aggravated assault, which requires a higher degree of culpability, *i.e.*, that which considers and then disregards the threat **necessarily** posed to human life by the offending conduct. There must be an element of deliberation or conscious disregard of danger not present to the same extent in, *e.g.*, either reckless endangerment, to which [O'Hanlon] admits, or driving while intoxicated. Aggravated assault is a second[-]degree felony, reckless endangerment and driving under the influence of alcohol are second[-]degree misdemeanors. The difference in grading reflects the relative seriousness of the crimes, and the differing levels of criminal intent involved. The quantum of recklessness required to prove the misdemeanors will not serve to support the felony. . . .
>
> [F]or the degree of recklessness contained in the aggravated assault statute to occur, the offensive act must be performed under circumstances which almost assure that injury or death will ensue. The recklessness must, therefore, be such that life threatening injury is essentially certain to occur. This state of mind is, accordingly, equivalent to that which seeks to cause injury. Examples of such behavior make the distinction clear. In *Commonwealth v. Daniels*, . . . 354 A.2d 538 ([Pa.] 1976), appellant had fired a gun into a crowd; in *Commonwealth v. Laing*, . . . 456 A.2d 204 ([Pa. Super.] 1983), appellant drove his car into a crowd, after having aimed it at an individual; in [*Commonwealth v.*] *Scofield*, [521 A.2d 40 (Pa. Super. 1987)], the appellant drove at a pedestrian. . . . In each of these instances, the defendant could reasonably anticipate that serious bodily injury or death would be the likely and logical consequence of his actions. In each case, the consequence was ignored.

*Id.* at 618 (emphasis in original; citations omitted). The Court concluded O'Hanlon's behavior, "while worthy of criminal penalty," was "not so egregious" as to warrant a finding of recklessness in satisfaction of the aggravated assault statute. *Id.*

Thus, there is certainly nothing in *O'Hanlon* expressly overruling, or creating an exception to, the *Taylor* line. Nor do we read *O'Hanlon* to have implicitly adopted a DUI-specific malice standard *sub silentio*. The "distinction" addressed by *O'Hanlon* was not between DUI and non-DUI cases. Peters's Brief at 20. Rather, the distinction drawn by the Court was between ordinary recklessness and the heightened degree of recklessness

necessary to sustain a conviction of aggravated assault. The case turned on the language of the aggravated assault statute, not the facts of the case, and the aggravated assault statute is, of course, not unique to DUI. That *O'Hanlon* happened to involve a DUI was neither here nor there with respect to the Court's legal elucidation of the malice element of aggravated assault.

Moreover, the "essentially certain to occur" language is not the meaningful departure from the *Taylor* definition that Peters perceives it to be. Again, under the long line of precedent beginning with *Taylor*, malice is present if the defendant consciously disregarded an unjustified and **extremely high risk** that his actions might cause death or serious bodily harm. This standard is not met simply because the defendant's actions might cause death or serious bodily harm. The defendant's conduct must create an extremely high risk of such a result. In other words, his or her actions must render death or serious injury very likely. The "essentially certain to occur" language likewise connotes a significant likelihood of death or serious injury. If something is essentially certain to occur, this means it is extremely likely but not guaranteed. *O'Hanlon* reaffirmed *Taylor* in different words.

This reading of *O'Hanlon* is reinforced by properly considering the "essentially certain to occur" language in context. As Peters himself emphasizes, "[c]ontext is critical in understanding *O'Hanlon.*" Peters's Brief at 18. In the next two sentences, the *O'Hanlon* Court offered examples of malicious behavior to "make the distinction [between ordinary recklessness and recklessness sufficient to support aggravated assault] clear." *O'Hanlon*, 653 A.2d at 618. "In each of these instances," the Court noted, "the defendant could reasonably anticipate that serious bodily injury or death would be the likely and logical consequence of his actions." *Id.* This language too indicates malice requires a

high likelihood of serious bodily injury or death, in line with the *Taylor* formulation. It does not suggest a distinct and heightened malice standard particular to DUI cases.

Indeed, just four years after *O'Hanlon*, this Court quoted *O'Hanlon*'s discussion of the malice standard in a case that had nothing to do with DUI. *See Commonwealth v. Thompson*, 739 A.2d 1023 (Pa. 1999). Thompson opened fire on a public street, killing one victim and narrowly missing another. He was convicted, *inter alia*, of first-degree murder and aggravated assault and sentenced to death. On direct appeal to this Court, he challenged the sufficiency of the evidence supporting his aggravated assault conviction. This Court looked to *O'Hanlon* in defining the *mens rea* required for aggravated assault. *See id.* at 1028 ("[F]or the degree of recklessness contained in the aggravated assault statute to occur, the offensive act must be performed under circumstances which almost assure that injury or death will ensue."), *quoting O'Hanlon*, 653 A.2d at 618. Clearly, the *Thompson* majority, which included four members of the majority in *O'Hanlon*, did not view *O'Hanlon* as establishing a DUI-specific standard for malice where it quoted this case in deciding a shooting murder.[22]

Peters also misreads *Packer*. In *Packer*, the defendant huffed[23] immediately before and while driving her car, became unresponsive as a result, and caused a fatal collision. Packer had previously lost consciousness while huffing, and she knew huffing could cause her to pass out. She was convicted of third-degree murder and aggravated assault. This Court granted her request to review the issue of whether "the prosecution

---

[22] The year prior, this Court quoted *O'Hanlon* in another DUI case. *See Comer*, *supra*. But, just like in *O'Hanlon*, the Court tied its description of malice to the aggravated assault statute, not to the facts of the case. *See* 716 A.2d at 596 ("[F]or the degree of recklessness contained in the aggravated assault statute to occur, the offensive act must be performed under circumstances which almost assure that life threatening injury will ensue."), *quoting O'Hanlon*, 653 A.2d at 618.

[23] "Huffing" refers to the act of inhaling noxious gas from an aerosol can to get high. *See Packer*, 168 A.3d at 162 n.1.

prove[d] beyond a reasonable doubt that [she] acted with sufficient malice" to support the convictions. *Packer*, 168 A.3d at 166 (quotation marks and citation omitted). As noted, the *Packer* Court repeatedly endorsed the *Taylor* definition of malice. *See id.* at 168 ("[O]ur courts have consistently held that malice is present under circumstances where a defendant did not have an intent to kill, but nevertheless displayed a conscious disregard for an unjustified and extremely high risk that his actions might cause death or serious bodily harm.") (quotation marks and citation omitted); *id.* at 172 ("The standard for malice . . . reaffirmed today requires recklessness of consequences and the conscious disregard for an unjustified and extremely high risk that a chosen course of conduct might cause a death or serious personal injury."). Applying this standard to the facts of Packer's case, the Court concluded her conduct was malicious:

> This is not a typical case of ordinary recklessness that arises when someone chooses to drive while intoxicated. . . . Packer consciously disregarded an unjustified and extremely high risk that her chosen course of conduct might cause a death or serious bodily injury. . . . Because of Packer's history of losing consciousness after huffing and her knowledge of the immediacy of the effects of huffing on her, she could reasonably anticipate that serious bodily injury or death would be the likely and logical consequence of [her] actions . . . [but] the consequence was ignored.

*Id*. at 171 (quotation marks and citations omitted). Hence, *Packer* reaffirmed and applied the standard, universally applicable *Taylor* definition of malice in a case involving DUI; it did not adopt or endorse a distinct malice standard in the DUI context.

In fact, while *Packer* quoted the "essentially certain to occur" language from *O'Hanlon* in the course of summarizing that opinion, *see id.* at 170, this Court confirmed *O'Hanlon* did not change the law or create a DUI-specific malice test. *Packer* summarized the holding of *O'Hanlon* as providing that "the requisite *mens rea* is only met in circumstances where 'the defendant could reasonably anticipate that serious bodily injury or death would be the likely and logical consequence of his actions . . . [but] the consequence was ignored.'" *Id*. *O'Hanlon* "applied the **longstanding** definition of malice

requiring a heightened level of recklessness, and applied it to the facts of th[at] case[].” *Id.* at 171 (emphasis added). The longstanding definition of malice at the time of *O'Hanlon* was the *Taylor* standard, not an entirely new, heightened DUI-only test innovated in *O'Hanlon* itself. Similarly, the *Packer* Court noted *O'Hanlon* "**reiterated**" "[t]he standard for malice" "requir[ing] recklessness of consequences and the conscious disregard for an unjustified and extremely high risk that a chosen course of conduct might cause a death or serious personal injury." *Id.* at 172 (emphasis added). That is, the *Packer* Court recognized *O'Hanlon* reaffirmed the existing *Taylor* definition and did not adopt a special malice standard applicable to DUI cases only.

We reach the same conclusion today. To put it plainly: malice is malice. The standard for malice is the same regardless of whether the defendant drove while intoxicated or fired a gun. Malice is present if the defendant consciously disregarded an unjustified and extremely high risk that his chosen course of conduct might cause death or serious bodily injury.

The Superior Court majority applied that standard here. Relying on our decision in *Packer*, the majority concluded "the evidence was sufficient to demonstrate [Peters] 'displayed a conscious disregard for an unjustified and extremely high risk that his actions might cause death or serious bodily harm.'" *Peters*, 320 A.3d at 1243, *quoting Packer*, 168 A.3d at 168.[24] Although the majority acknowledged "an impaired driver who causes

---

[24] The trial court gave the jury a similar definition of malice:

> Malice is described in several ways. I have taken three separate ways as described from the cases in the Commonwealth of Pennsylvania.

> The first: A killing is with malice if the defendant's actions show his wanton and willful disregard of an unjustified and extremely high risk that his conduct would result in death or serious bodily injury to another person. In this form of malice, the Commonwealth need not prove that the defendant specifically intended to kill another person.

(continued…)

the death of another does not typically act with the requisite malice to support convictions of third-degree murder and aggravated assault[,]" the majority concluded this case, "like *Packer*, . . . [4]is not a typical case of ordinary recklessness that arises when someone chooses to drive while intoxicated.'" *Id.* at 1237, 1241, *quoting Packer*, 168 A.3d at 166, 171. Accordingly, we hold the majority applied the correct standard for malice, and turn below to consideration of whether the evidence was sufficient to support a finding of malice under this proper standard.

### B. Application

Peters claims the Commonwealth's evidence was insufficient to prove malice. He compares his case, again, to *Packer*, noting the defendant there "use[d] a substance that would render her unconscious **and had done so in the past**." Peters's Brief at 25 (emphasis in original). Here, by contrast, Peters argues he had no prior history of drunk driving, none of the videos show him "staggering or otherwise exhibiting" signs of visible intoxication, and "[n]o one warned [him] he was too drunk to operate a car." *Id*. at 23-24. "[W]ithout horns honking, lights flashing, or other communications," he claims his reckless driving before the crash is inadequate "to prove . . . conscious disregard of a risk." *Id*. at

---

The Commonwealth must prove, however, that the defendant took action or engaged in conduct while consciously; that is, knowingly, disregarding the risk his conduct was creating and that his disregard of that risk demonstrated his extreme indifference to the value of human life.

Malice has also been defined as follows: A wickedness of disposition, a hardness of heart, cruelty, recklessness of consequences and a mind regardless of social duty indicating an unjustified disregard for the probability of death or great bodily harm and an extreme indifference to the value of human life.

The third description of malice is a conscious disregard of an unjustified and an extremely high risk that the defendant's actions might cause death or serious bodily harm.

N.T. Trial, 9/17/21, at 72-74.

28. In his view, the majority erroneously "f[ound] the amount of time [ ] Peters drove before the accident . . . sufficient in and of itself to prove malice." *Id.* at 27; *see id.* at 28 ("Driving drunk, whether for thirty seconds or thirty minutes, does not equate with recklessness without more.").

The Commonwealth responds Peters's "sustained recklessness" before the crash was sufficient to prove malice. Commonwealth's Brief at 31. The Commonwealth notes, "after drinking for approximately seven hours," Peters "struggl[ed] with [a] payment machine" and broke the mechanical gate at the parking garage. *Id.* at 36-37. In the Commonwealth's view, "[t]his destruction of the arm" demonstrates "[Peters's] utter disregard for others" as "no average person would have made the decision to simply walk up to the gate and destroy it[.]" *Id*. at 37. The Commonwealth argues Peters's recklessness continued after he exited the garage: driving through a stop sign, leaving his taillights off, nearly striking another car, repeatedly shifting "from excessive speeding to going well below the speed limit[,]" driving over the fog line, and "overshooting his exit **twice**, once leading him into another state[.]" *Id.* at 38-39 (emphasis in original). Despite those warning signs, Peters "decided it would be prudent to unbuckle his seatbelt, reach across the car to the passenger seat floor and begin rummaging through his backpack to find his cellphone[,]" all while driving 115 miles per hour, with a BAC nearly double the legal limit. *Id.* at 39-40. To the Commonwealth, when Peters reached for his backpack, he "might as well have been playing Russian Roulette[.]" *Id.* at 58. The crash, in the Commonwealth's eyes, was "not only foreseeable," but an "inevitable . . . result of [Peters's] malicious conduct." *Id.* at 43.

We agree with the Commonwealth. Unquestionably, "the decision to drive while under the influence of alcohol and/or a controlled substance does not, standing alone, constitute malice." *Packer*, 168 A.3d at 170. Nevertheless, there are DUI cases that

meet the standard of malice. Most notably, in *Packer*, as discussed, the defendant huffed "immediately prior to and while operating a vehicle on a public highway." *Id.* at 171. "She knew, from the clearly marked label" that noxious gas from the aerosol can was "not intended to be ingested[,]" and "knew that huffing had caused her to lose consciousness on other occasions in the past." *Id.* Despite that knowledge, "she nonetheless made the conscious and informed decision to huff . . . immediately before driving on a public roadway and again while temporarily stopped at a red light." *Id.* Unsurprisingly, she lost consciousness and crashed her car into another vehicle, killing its driver. We concluded *Packer's* was "not a typical case of ordinary recklessness that arises when someone chooses to drive while intoxicated[,]" and sustained her conviction for third-degree murder. *Id.*

*Taylor* offers another example. There, the defendant was driving drunk at a high rate of speed when he struck two boys riding their bicycles, killing one of them. This Court concluded:

> The intoxicated condition of the driver, the excessive rate of speed which he was travelling, the distance the bodies and bicycles were propelled upon impact, his awareness that this was an area where children were likely to traverse, the absence of any physical or climatic condition which could explain or contribute to the happening of the accident and the appellant's failure to stop immediately after impact, all exhibit the wickedness of disposition, the hardness of heart, cruelty and recklessness associated with [then-]murder in the second degree.

*Taylor*, 337 A.2d at 563-64.

Here, the trial evidence established that Peters had multiple drinks on the night of the crash. Although less risky means of transportation were available to him, including an offer by a co-worker to drive him home, Peters stuck to his plan to drive home himself. However, at the parking garage, Peters ran into trouble. Video surveillance footage showed Peters took several minutes to operate the payment machine and, at one point, wandered away from the kiosk. More alarming, though, is Peters's decision to inflict

property damage just to exit the garage. When the mechanical arm blocking the exit did not move, most people would have accepted defeat and taken a train or a taxi home. But not Peters. Instead, he got out of his car and manually lifted one of the mechanical arms high enough to allow his car through, breaking the mechanical arm in the process. Surveillance footage shows the visibly-broken arm dangling in Peters's wake. "Yet he was not deterred." *Peters*, 320 A.3d at 1243. Instead, Peters left the garage, rolled through a stop sign, and proceeded to the highway.[25]

There, Peters consciously disregarded signs "that continuing to drive, while significantly impaired, posed an extremely high and unjustifiable risk to others." *Id.* The trial evidence established Peters drifted over the fog line, nearly sideswiped another car, and randomly changed speeds — shifting between driving much faster or much slower than the speed limit. Peters also missed his exit home, not once but twice, errors which were seemingly intoxication-related given that Peters had lived in the area for six years. Another driver said Peters had to slam on his brakes when he exited in New Jersey, a move so abrupt that the driver thought Peters was "going to hit the exit[.]" N.T. Trial, 9/13/21, at 141.

---

[25] The dissent below concluded "Peters'[s] decision to drive his vehicle instead of taking a train or taxi, and to use a highway rather than a local road, is of no moment" as "the mere decision to drive intoxicated does not satisfy the malice requirement." *Peters*, 320 A.3d at 1252 (Lazarus, J., dissenting). However, the fact that drunk driving is not dispositive of malice does not make it irrelevant. It is no secret that driving while intoxicated is incredibly dangerous. According to the National Highway Traffic Safety Administration, "about 32 people in the United States die in drunk-driving crashes" "[e]very day[.]" *Drunk Driving,* National Highway Traffic Safety Administration, https://www.nhtsa.gov/risky-driving/drunk-driving (last visited Apr. 29, 2026). Accordingly, although "the decision to drive while under the influence of alcohol and/or a controlled substance does not, standing alone, constitute malice[,]" *Packer*, 168 A.3d at 170, it is still a relevant factor to be considered when assessing the sufficiency of the evidence. Moreover, the route a drunk driver chooses to take, which can impact, *inter alia*, his speed, exposure to other motorists, and the difficulty of driving, is distinct from his decision to drive intoxicated and is also properly considered in the assessment of malice.

Most egregious, though, is Peters's conscious decision to take his eyes off the road. Peters was driving around 113 miles per hour in a 55-mile-per-hour zone, with a BAC nearly double the legal limit, when he decided to check the GPS on his phone. Unfortunately, the phone was in Peters's backpack. There was an easy solution to this problem. Presumably, Peters could have pulled over to the side of the highway when it was safe to do so and then, with the car stopped, reach for his phone. But Peters did not avail himself of this safer option. Instead, he chose to unbuckle his seatbelt and rummaged on the passenger-side floor for his phone while he was still driving. He did not even bother to slow down his car. To the contrary, the black box data showed Peters actually **sped up** the car half a second before the crash to 115 miles per hour. As the Superior Court majority aptly noted, Peters's sustained and "extremely reckless conduct . . . 'virtually guaranteed some manner of accident would occur[.]'" *Peters*, 320 A.3d at 1243, *citing Packer*, 168 A.3d at 171 (brackets omitted). The totality of this evidence was sufficient to prove Peters consciously disregarded an unjustified and extremely high risk that his drunk driving might cause death or serious bodily injury.

Although Peters claims "[t]here was no conduct after the crash, such as belligerence or an attempt to fight or flee, that established that he was aware of his reckless conduct[,]" Peters's Brief at 24, *citing Scofield*, *supra* (internal quotations omitted), he was hardly in a condition after the crash to "fight or flee." As the Commonwealth explains, "[Peters] had to be removed from his car, carried to safety, and transported to the hospital where he remained for a week." Commonwealth's Brief at 51. Accordingly, Peters's behavior after the crash is not a mitigating factor here.

The evidence that Peters applied the brake, at most, four-tenths of a second before the crash also does not sway our analysis. Half a second before the crash, Peters was driving 115 miles per hour in a 55-mile-per-hour zone. This meant Peters was traveling

approximately 168 feet per second. At that point, braking was just as futile as trying to catch a fired bullet. Accordingly, although Peters's belated attempt to brake is relevant, it does not outweigh the overwhelming evidence of malice before the crash. When Peters ignored the numerous signs he was too impaired to drive, he consciously disregarded the unjustified and extremely high risk that he might cause death or serious bodily injury. That less than a split second before impact, he futilely attempted to avoid the all-but-inevitable consequence of his malicious actions, does not erase his malice.

Peters's argument that "[n]o one warned [him] he was too drunk to operate a car[,]" Peters's Brief at 23, is also unconvincing. Certainly, if someone told the defendant that he was too drunk to drive, then that evidence would be probative of whether he acted with malice. *See Commonwealth v. Urbanski*, 627 A.2d 789, 793 (Pa. Super. 1993) (finding sufficient evidence of malice where Urbanski's "wife repeatedly reminded him of the danger [of his erratic driving] and asked many times if she could drive the car"). However, the lack of a verbal warning does not free a defendant to ignore the obvious signs it is unsafe for him to drive. We would not expect bystanders to warn an adult it is unsafe to point a loaded gun at someone's head in order to infer malice. Here, although there may not have been an express verbal warning, Peters received multiple signs he was too impaired to drive safely: an offer to drive him home from a co-worker, his destruction of the mechanical arm at the parking garage, near miss of another car, inability to keep a consistent speed, and twice passing his exit. Viewed properly, in the light most favorable to the Commonwealth, the evidence indicates Peters had ample notice he was too impaired to safely drive, and consciously disregarded the unjustified and extremely high risk that continuing to drive while impaired might cause a death or serious bodily injury. Therefore, the evidence was sufficient to prove malice.

## III. Conclusion

Today, as in *Packer*, we reaffirm the longstanding definition of malice. Malice is present if the defendant consciously disregarded an unjustified and extremely high risk that his conduct might cause death or serious bodily injury. This standard is the same regardless of the particular conduct at issue. Whether, for instance, the defendant drove while intoxicated or fired a gun, the identical definition of malice applies. Again, malice is malice. The Superior Court majority applied the correct standard for malice here. It also correctly held the evidence was sufficient to satisfy this standard. Accordingly, we affirm the order of the Superior Court.

Chief Justice Todd and Justices Donohue, Wecht, Mundy and Brobson join the opinion.

Justice McCaffery did not participate in the consideration or decision of this matter.